David HARNICHER and Stephanie
Harnicher, Plaintiffs and
Appellants,

v.

UNIVERSITY OF UTAH MEDICAL
CENTER, Defendant and
Appellee.

No. 960204.

Supreme Court of Utah.

July 31, 1998.

Jerome H. Mooney, Wendy M. Lewis, Salt Lake City, for plaintiffs.

David G. Williams, Brian P. Miller, Salt Lake City, for defendant.

HOWE, Chief Justice:

Plaintiffs David and Stephanie Harnicher, parents of triplets born after in vitro fertilization using donor sperm, brought this action for medical malpractice alleging negligent infliction of emotional distress against defendant University of Utah Medical Center for using sperm from a donor other than the one that the couple had allegedly selected. The trial court found no evidence of physical injury or illness to support an action for negligent infliction of emotional distress and granted summary judgment in favor of the Medical Center. The Harnichers appeal.

## FACTS

David and Stephanie Harnicher sought treatment for infertility at the University of Utah Medical Center Fertility Clinic. Artificial insemination using David's sperm yielded no results. The Harnichers then contacted Dr. Ronald L. Urry of the Fertility Clinic regarding the possibility of in vitro fertilization. Dr. Urry suggested a procedure known as "micromanipulation" wherein holes are drilled in the mother's harvested ova to facilitate fertilization. The ova are then placed in a petri dish with harvested sperm and the fertilized ova are subsequently implanted in the uterine wall, enabling the mother to bear her own child. Dr. Urry recommended using a mixture of the husband's sperm and donor sperm.

The Harnichers agreed. The micromanipulation method increased the chances that Stephanie would bear David's biological child. Additionally, the "mixed sperm" procedure potentially allowed the couple to believe and represent that any child born would be David's because if the donor closely matched David in physical characteristics and blood

type, the parents would never be sure which sperm actually fertilized the ovum. Therefore the Harnichers evaluated the donor information provided by the Medical Center on that basis. The Medical Center maintains that the couple narrowed the selection to four donors and signed consent forms acknowledging that their doctor would make the final selection. The Harnichers assert, however, that they specifically and exclusively selected donor # 183. Stephanie testified that when clinic employee Doug Carroll informed her that only frozen sperm, which has a lower success rate than fresh, was available from donor # 183 and asked her if she still wanted to do the donor backup, she replied, "Only if you can get 183.... I'll take my lower chances. Let's just go with 183."

The procedure was performed, and Stephanie gave birth to triplets, two girls and one boy. Shortly after their birth, one of the babies became ill, requiring blood tests. Two of the children's blood type revealed that they could not possibly have been the children of either David or donor # 183. A DNA test on one of the children established that the father was actually donor # 83, another donor on the Harnichers' list.

Donor # 183, like David, had curly dark hair and brown eyes. Donor # 83 had straight auburn hair and green eyes. One of the triplets has red hair. The Harnichers maintain that the Medical Center's mistaken use of the wrong donor thwarted their intention of believing and representing that David is the children's biological father. They brought this action against the Medical Center alleging that they have "suffered severe anxiety, depression, grief, and other mental and emotional suffering and distress which has adversely affected their relationship with the children and with each other." However, both David and Stephanie testified in their depositions that they had not experienced any bodily harm as a result of the mistake.

After the Medical Center moved for summary judgment, the Harnichers consulted a psychologist, Jeff Kocherhans, Ph.D., who administered various psychological tests and concluded that David suffered from a variety of symptoms of depression and anxiety, in-

cluding sleep disturbance, fatigue, impaired concentration, and diminished work productivity. Kocherhans diagnosed Stephanie with "major Depressive Disorder, recurrent, severe, Panic Disorder and Generalized Anxiety Disorder," manifested by low mood, fatigue, crying spells, decreased appetite and weight loss, difficulty concentrating, pounding heart, shaking, cold flashes, shortness of breath, choking sensation, teeth grinding, muscle tension, and fingernail biting. Prior to seeking treatment at the Medical Center, Stephanie had counseled with a psychologist for some of the same symptoms and had also received stress medication from a medical doctor. Kocherhans' diagnoses appeared in an affidavit which the Harnichers filed more than a month after the Medical Center moved for summary judgment.

The trial court concluded that "there has been no physical harm or injury sustained by the plaintiffs that would enable them to maintain an action for negligent infliction of emotional distress" and that the plaintiffs' alleged physical symptoms "are transitory, temporary, and not the kind of physical manifestations of a mental illness that provide the basis for a claim of negligent infliction of emotional distress." The Harnichers contend that their disappointment in the results of the donor mixup has resulted in mental illness accompanied by physical symptoms. They ask this court to hold that a diagnosed mental illness in and of itself is sufficient to support a cause of action for negligent infliction of emotional distress.

## ANALYSIS

In order to properly grant summary judgment, the court must view the facts in the light most favorable to the non-moving party, *see Clover v. Snowbird Ski Resort,* 808 P.2d 1037 (Utah 1991), and find that there are no disputed issues of material fact and that the moving party is entitled to judgment as a matter of law. See Utah R. Civ. P. 56(c); *DOIT, Inc. v. Touche, Ross & Co.,* 926 P.2d 835 (Utah 1996). We review the trial court's conclusions of law for correctness, granting

them no deference. *See Higgins v. Salt Lake County,* 855 P.2d 231, 233 (Utah 1993).

## I.  BACKGROUND

In *Johnson v. Rogers,* 763 P.2d 771 (Utah 1988), we first recognized negligent infliction of emotional distress as a cause of action in Utah. In that case, a father and his eight-year-old son were waiting to cross the street at an intersection when a truck jumped the curb and struck them, killing the child and injuring the father. Justice Durham, in the lead opinion, reviewed the history and theoretical foundations of the action for negligent infliction of emotional distress and determined that such an action exists in Utah. *Id.* at 782. A majority of the court recognized the need to establish a clear standard. *Id.* at 785 (Zimmerman, J., concurring in part). The majority selected language mirroring the rule proffered in section 313 of the Restatement (Second) of Torts. This standard provides:

"(1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor

(a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and

(b) from facts known to him, should have realized that the distress, if it were caused, might result in illness or bodily harm.

(2) The rule stated in Subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other."

*Id.* at 780 (emphasis omitted) (quoting Restatement (Second) of Torts § 313 (1965)). Subsection (2) constitutes the zone of danger test.[1] "Simply stated, the zone of danger rule 'allows one who is himself or herself threatened with bodily harm in consequence

---

1. *Intentional* infliction of emotional distress, in contrast, does not require that plaintiff actually   be at risk of bodily harm. *See* Restatement (Second) of Torts § 312.

of the defendant's negligence to recover for emotional distress resulting from viewing the death or serious physical injury of a member of his or her immediate family.'" *Clohessy v. Bachelor*, 237 Conn. 31, 675 A.2d 852, 857 (1996) (quoting *Bovsun v. Sanperi*, 61 N.Y.2d 219, 473 N.Y.S.2d 357, 461 N.E.2d 843 (1984)).[2]

Because the instant case does not involve injury to a third party, we address only the application of subsection (1). We addressed similar circumstances in *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970 (Utah 1993). In that case, construction workers who had unknowingly inhaled asbestos sought to recover damages for negligent infliction of emotional distress due to fear of cancer. We observed that "[i]n *Johnson*, we were primarily concerned with application of the rule outlined in [section 313] subsection (2). In the instant case, plaintiffs are not seeking recovery for trauma inflicted on them because of harm or peril to one nearby; plaintiffs allege that they themselves inhaled asbestos." *Id.* at 974. We applied the section 313(1) requirement for "illness or bodily harm" and found that the plaintiffs had neither offered evidence of symptoms so severe as to constitute mental illness, nor shown that they had suffered physical symptoms as a result of their distress. *Id.* at 975. We emphasized that "the emotional distress suffered must be severe; it must be such that 'a reasonable [person,] normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'" *Id.* (quoting *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509, 520 (1970)). Consequently, we held that "[p]laintiffs' mere unsubstantiated opinions that they have suffered severe anxiety as a result of their exposure do not create a triable issue of fact that would withstand summary judgment." *Id.* Justice Zimmerman, joined by the majority, explicitly declined to postulate whether "mental illness, in the absence of

physical manifestation, is sufficient to support a claim." *Id.* at 982 (Zimmerman, J., concurring in part and concurring in the result).

The comments to section 313 restrict the scope of a claim for negligent infliction of emotional distress. Comment "a" declares that the "rule stated in this Section does not give protection to mental and emotional tranquillity in itself." Restatement (Second) of Torts § 313 cmt. a (1965). Comment "c" articulates a form of "reasonable person" test by noting that in contrast to the section 312 rule for intentional creation of emotional distress, "one who unintentionally but negligently subjects another to such emotional distress does not take the risk of any exceptional physical sensitiveness to emotion which the other may have unless the circumstances known to the actor should apprise him of it." Restatement (Second) of Torts § 313 cmt. c (1965). These comments recognize the fact that "[w]e cannot permit every claim for negligent infliction of emotional distress to go to a jury under such varying standards as each trial judge may choose." *Johnson*, 763 P.2d at 785 (Zimmerman, J., concurring in part).

## II. BODILY HARM

In opposing the Medical Center's motion for summary judgment, the Harnichers' filed the affidavit of Jeff Kocherans, wherein he listed various conditions allegedly suffered by the Harnichers as a result of their emotional distress. He averred that David Harnicher suffered from sleep disturbance, fatigue, impaired concentration, and diminished work productivity. He further stated that Stephanie suffered from low mood, fatigue, crying spells, decreased appetite and weight loss, difficulty concentrating, pounding heart, shaking, cold flashes, shortness of breath, choking sensation, teeth grinding, muscle tension, and fingernail biting.

---

2. *See also Lawson v. Salt Lake Trappers*, 901 P.2d 1013 (Utah 1995) (parents of a child struck by a baseball while watching a game lacked the requisite "fear of injury or peril"); *Boucher v. Dixie Med. Ctr.*, 850 P.2d 1179, 1182 (Utah 1992) (parents of a young adult rendered brain damaged and paraplegic by alleged medical malpractice "did not allege that they were in zone of danger;

therefore they did not state a claim for negligent infliction of emotional distress, as this claim is defined in Utah"); *Hansen v. Sea Ray Boats*, 830 P.2d 236, 242 (Utah 1992) (plaintiff in boat saw family members in the water receive severe electrical shocks and feared for her own safety but was outside the zone of danger).

In contrast to this affidavit, the Harnichers' both denied having suffered any bodily harm as a result of the alleged donor sperm mix-up in their sworn depositions, which were taken well before Kocherans' affidavit was filed. When David was asked, "[i]s there any other kind of damage [other than mental and emotional stress] that you claim you have suffered," he replied, "[n]o, I can't think we've claimed anything other than that at the moment." Moreover, in response to a question asking Stephanie to describe what bodily harm she claimed she had experienced as a result of the donor sperm mix-up, she responded, "[a]s a result of the mix-up, I have not claimed any bodily harm."

■ Because of the variance between the Harnichers' sworn deposition and Kocherans' subsequent affidavit, we do not comment on whether the symptoms listed in Kocherans' affidavit qualify as "bodily harm" under section 313(1) of the Restatement (Second) of Torts. The general rule is that in a summary judgment proceeding, "when a party takes a clear position in a deposition, that is not modified on cross-examination, he may not thereafter raise an issue of fact by his own affidavit which contradicts his deposition, unless he can provide an explanation of the discrepancy." *Webster v. Sill,* 675 P.2d 1170, 1172–73 (Utah 1983).

As stated above, the Harnichers did not consult Kocherans until after the Medical Center moved for summary judgment, presumably for the purpose of obtaining an affidavit to oppose summary judgment. The only explanations that they offer for the discrepancy between their deposition testimony and Kocherans' affidavit is that they are "not the type of people who would easily seek medical treatment" and that the questions asked at their depositions were not sufficiently specific to allow them to properly respond. We reject each of these explanations.

First, the Harnichers' reluctance to seek medical treatment fails to explain why they denied any physical harm at the deposition but asserted such harm during their consultation with Kocherans, which occurred after the Medical Center had filed its motion for summary judgment. These types of harm are not of the type that would require diagnosis or discovery by a medical doctor or psychologist. In fact, unless Kocherans observed the Harnichers while they ate, worked, and slept, the Harnichers must have described these conditions to him. Thus it is difficult to understand how the Harnichers were able to describe these conditions so accurately to Kocherans when they were not able to do so during their sworn depositions.

Second, although the deposition questions at issue might not have been as direct and clear as they might have been, the Harnichers' counsel should have understood these questions and clarified his clients' responses thereto on crossexamination, if necessary. As discussed above, in *Mountain Fuel,* we required bodily harm for a cause of action. 858 P.2d at 975. Harnichers' counsel therefore should have known that the Medical Center's questions were directed at evidence of bodily harm. The Harnichers' alleged confusion regarding these questions is not a reasonable explanation for the discrepancy between their deposition testimony and Kocherans' affidavit.

For the reasons stated above, we conclude that the trial court did not err in finding that the Harnichers had not suffered any bodily harm or physical injury that would support an action for negligent infliction of emotional distress.

## III. MENTAL ILLNESS

■ The Harnichers contend that their disappointment in their children has caused them severe emotional distress to the point of mental illness. They ask us to hold that "diagnosed mental illness," standing alone, is sufficient to support a claim for negligent infliction of emotional distress. As in *Hansen v. Mountain Fuel,* it is unnecessary for us to decide that question here. We recognize that severe emotional distress can cause mental illness and that genuine mental illness constitutes real harm. Nonetheless, practicality demands that the standard of proof in such cases be more than merely subjective. *See Molien v. Kaiser Found. Hosps.,* 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813, 818 (1980). As previously stated, in *Mountain Fuel* we emphasized that the "emotional

distress suffered must be severe; it must be such that 'a reasonable [person,] normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.' " 858 P.2d at 975. Such a threshold test is particularly necessary because the existence of and cause of a mental illness often is not obvious in a manner comparable to a physical injury or illness.

As a result of their fertility treatment, the Harnichers became the parents of three normal, healthy children whom the couple suggest do not look as much like David as different children might have and whose blood type could not be descended from his. This result thwarted the couple's intention to believe and represent that the triplets are David's biological children. Exposure to the truth about one's own situation cannot be considered an injury and has never been a tort. Therefore, destruction of a fiction cannot be grounds for either malpractice or negligent infliction of emotional distress.

The Harnichers' assertion that David did not want children unless they were biologically his own is belied by the couple's knowing consent to the use of donor sperm. Stephanie testified that she could say "with probability," without ever having seen either donor, that the children of donor # 183 would have been better looking than her triplets and that in her mind, she was damaged by that fact. During her deposition, she was asked and testified as follows:

Q. Do you claim that you have been damaged any by the difference in personality or traits and characteristics inherited by your children versus what you think they would have inherited from 183?

A. Definitely.

Q. How have you been damaged?

A. Feeling-wise, it hurts. I mean, it just—it saddens me.

Realistically, however, it is impossible to know whether the children of donor # 183 would have been superior in any way to the triplets or, indeed, whether the same number of babies or none at all would have resulted from the use of the less effective frozen sperm. The supposition that the road not taken would have led to a better result is a common human fallacy; it cannot support an action for negligent infliction of emotional distress. The Harnichers do not allege that the triplets are unhealthy, deformed, or deficient in any way. Nor do they claim any racial or ethnic mismatch between the triplets and their parents. In fact, the couple has presented no evidence at all that the physiological characteristics of three normal healthy children, which could not have been reliably predicted in any event, present circumstances with which " 'a reasonable [person,] normally constituted, would be unable to adequately cope.' " *Mountain Fuel*, 858 P.2d at 975.

## CONCLUSION

As noted above, the section 313(1) rule does not give protection to mental and emotional tranquility per se. Consequently, much of the " 'emotional distress' which we endure ... is not compensable." *Thing v. La Chusa*, 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814, 829 (1989) (denying recovery for negligent infliction of emotional distress where mother of injured child arrived at the scene after accident had already occurred). The Harnichers have failed to raise a triable issue of fact that they have suffered bodily harm. Furthermore, they have not shown that the Medical Center's alleged negligence is of the type that is likely to cause severe and unmanageable mental distress in a reasonable person normally constituted. *See Mountain Fuel*, 858 P.2d at 975. Therefore, we hold that the Harnichers have failed to "state a claim for negligent infliction of emotional distress, as this claim is defined in Utah." *Boucher*, 850 P.2d at 1182.

Affirmed.

ZIMMERMAN, J., concurs in Chief Justice HOWE's opinion.

RUSSON, J., concurs in the result.

DURHAM, Associate Chief Justice, dissenting:

On review of summary judgment, this court is obligated to view the facts in the light most favorable to the non-moving party and to find that there are no disputed issues

of material fact. *Clover v. Snowbird Ski Resort*, 808 P.2d 1037 (Utah 1991). This the majority has failed to do.

This court has, as the majority notes, adopted the standard set forth in section 313 of the Restatement of Torts (Second) for recovery for negligent infliction of emotional distress: liability exists for "illness or bodily harm" resulting from negligent acts. I believe first, that the majority opinion has conflated the "illness" factor with the "bodily harm" part of the standard, and second, it has inappropriately resolved disputed issues of material fact regarding the severity of the symptoms actually alleged to have been caused by the defendant's negligence.

The totality of facts in this limited record, in my view, reflect a rather different history than do those highlighted in the majority opinion. The plaintiffs sought treatment from the University of Utah Medical Center Fertility Clinic after a significant period of unsuccessful efforts to conceive a child, including at least two full cycles of unsuccessful artificial insemination. They had been informed before this contact that the likely cause of their infertility was Mr. Harnicher's low sperm count and decreased sperm mobility, which significantly decreased the possibility of conception by natural methods.

During their initial consultation with the medical staff at the University, they discussed alternative treatments including artificial insemination using Mr. Harnicher's sperm and in vitro fertilization using either Mr. Harnicher's sperm or donor sperm. Two artificial insemination attempts at the University were unsuccessful, and Mrs. Harnicher's gynecologist Dr. Hatasaka recommended they consult with Dr. Urry regarding in vitro fertilization. Mrs. Harnicher's deposition reflects her high degree of concern—from the very first interview with Dr. Urry—for identifying the treatment process that would most closely approximate natural conception of their biological child. The following excerpts from her deposition demonstrate this concern:

Answer [by Mrs. Harnicher]: Dr. Urry said that for us to be able to have our biological child, that we had to do in vitro; and to have our biological child—the chances of in vitro working, period, were 20 to 30 percent a cycle; and that he gave us a 14 percent chance of having our biological child from that in vitro cycle, from each cycle.

And he drew on the chalkboard how he would do it, how he would put David's sperm in one petri dish and David's sperm mixed with a donor in a second petri dish; and that he would micromanipulate the eggs in the one dish with David's-only sperm, and that if he was able to get embryos from that, he would use them first and then he would go to the donor mix next if we didn't get success with David's only.

And I was very apprehensive about the donor. I wanted David's biological child. And that's why I did in vitro....

. . . .

I expressed my apprehension to Urry. And I started asking him about how he selects donors, about their personality, what would be their motive to be a donor, whether it was philanthropic or financial—you know, I wanted to know that—and if he had any donors on his list that looked like David.

... I cried a lot at that meeting. I can remember that. I was very shook.

Question: And what was the cause or source of your stress and crying?

Answer: About the possibility of not being able to have David's biological child and having to use a donor....

He said that they did an extensive interview, screening of the donors, and that he screened—that he might only pick one in some large number of available donors based on their appearance and their personality and their intelligence and other inheritable traits....

And I was inquiring more and more about, you know, the type of people and the personality and whether he had anybody that looked like David.

After the first meeting with Dr. Urry described above, he gave plaintiffs his list of donors to review. Mrs. Harnicher described the following exchange with Dr. Urry and another employee of the hospital:

And he went through—I don't know—three to six different guys. And he gave me descriptions on their personalities. And then he narrowed it down to [donor number] 183. And then he told me that—well, in that same conversation, that if you're not—since you're not going to tell the kids, then you've also got to match the blood type....

I said, Gosh, I didn't even—I didn't even think about the blood type.

Thus, Dr. Urry recommended donor 183 because of matching blood type and the fact that the procedure he contemplated using would leave the actual biological parentage of any offspring entirely unknown as between Mr. Harnicher and the closely matched donor.

After further inquiries about donor 183, which met with reassuring responses about his general resemblance to her husband in physical appearance, Mrs. Harnicher settled on donor 183.

Answer: [A hospital employee] wanted to know if I had narrowed down my donor choices. And I said, I only have one choice. And I said, 183. And he said 183 was on the frozen [sperm] list only....

. . . .

And [he] said, Well, frozen doesn't work as well as fresh, and I can't get a fresh sample from 183, that this guy was on vacation, 183.

And he said, *Do you still want to do donor backup? And I said, Only if you can get 183....*

. . . .

*He called up again to confirm my donor just to be cautious because I didn't put down backups to 183.* I just put down one. And he said: I just want to verify that this is what you want to do. Do you want to do a donor mix? And I said, Yes if you can get 183. He said, Well, I can only get it frozen. Again, I said: I know. I know. I know. Let's just go with frozen.

(Emphasis added.) Mrs. Harnicher's deposition also details numerous attempts on her part to elicit specific physical details about donor 183, which seem to reflect her extreme concern about the resemblance issue.

Answer: . . . and then we got to 183. And I asked her about 183. And she said he was very good-looking, really nice, pretty eyes, and that—she said he was tall and thin and he was the most handsome of all the donors, always has a smile. So I asked her what his teeth looked like, because David has straight teeth and I wanted to know.

And then I asked her about his—if he had broad shoulders like David. I remembered that because she got a little annoyed with me because I was being too specific and she didn't want me to find out who the donors were, I assume. So she said: I can't tell you that about his shoulders. He has a nice build. And she said, Out of all of them, he looks most like David. And so then that was it.

Counsel for the defendant suggested—and the majority appears to have accepted the suggestion—that the plaintiffs are disappointed that their children are not "better looking." It is clear from a review of Mrs. Harnicher's deposition testimony that the primary issue for her was always the degree to which her children would look like Mr. Harnicher, their father, not their general "good looks." The majority opinion dismisses the Harnichers' desire to believe and represent that any children born as a result of the treatment they received were David Harnicher's biological offspring as a "fiction," which it cannot be tortious to destroy. But Mrs. Harnicher's testimony asserts that she would not have undergone donor sperm in vitro fertilization without the assurance that she, her husband, and any children they had would never need to know whether a biological bond existed. Had it not been for the University's negligence in mixing sperm from the wrong donor with David's, the "fiction" would never have been labeled a fiction; it would simply have been an "alternative reality" for the Harnicher family. In fact, in a sense, it was this alternative that the Harnichers negotiated for in their contract with the University, and that the University destroyed through its negligent act.

Moreover, the Medical Center actively encouraged the Harnichers to undergo in vitro fertilization and adopt this "fiction" despite

the fact that the Harnichers expressed reservations about raising a child who was not biologically their own, and despite current scientific literature which weighs heavily against encouraging such a "fiction." *See, e.g.,* Barbara Eck Menning, *Donor Insemination: the Psychosocial Issues,* 18 Contemp. OB/GYN 155, 162 (1981) (stating that it is "medically reprehensible" to alleviate the "genetic loss" by using semen mixing and telling patients that they will never know "which sperm got there first"); Robert D. Nachtigall et al., *Stigma, Disclosure, and Family Functioning Among Parents of Children Conceived Through Donor Insemination,* Fertility and Sterility, July–Dec., 1997, at 83 (encouraging disclosure of conception through donor insemination). The notion that there can be no loss or harm associated with the destruction of the very circumstance the University counseled the Harnichers to seek and promised to provide is unrealistic in human terms.

The most cursory review of the history of civilization demonstrates that the biological component of parentage has never been trivial in human affairs. *See, e.g.,* Dr. Th. H. Van De Velde, *Fertility and Sterility in Marriage: Their Voluntary Promotion and Limitation* 79–84 (F.W. Stella Browne trans., 1929); C. Lee Buxton & Anna L. Southam, *Human Infertility* 203–16 (1958); Charles A. Joël, *Fertility Disturbances in Men and Women* 317–27 (1971); *Fertility and Sterility* 359–69 (R.F. Harrison et al. eds., 1983). The trial court and the majority appear convinced that the loss of an unassailable assurance that one's children carry one's genes is of negligible value. Such a conviction is belied by the extraordinary lengths to which thousands of people in this era will go to pursue biological parenthood. *See generally Infertility: Diagnosis and Management* 17–19, 23 (James Aiman ed., 1984).

Some women will choose not to have children if they cannot honestly believe (whether the belief is accurate or not) that those children are biologically linked to their husbands; in fact, that was the objective of the in vitro procedure recommended to the Harnichers, as well as Dr. Urry's advice that donor 183 be selected for the donor mix because of his matching blood type and physical resemblance. Mrs. Harnicher testified that she was one of those women who only wanted children if there was a biological link to her husband, and I cannot concede that her choice is illegitimate because I, or any other judge, might view it as misguided. The majority reflects its failure to understand this point when it observes that "the Harnichers' assertion that David did not want children unless they were biologically his own is belied by the couple's knowing consent to the use of donor sperm." This misstates the Harnichers' claim—they have only asserted that they did not want children unless it would be highly unlikely that they would ever know that their child was not biologically David's, thus permitting the assumption of biological continuity. The use of donor sperm from a closely-matched donor, when mixed with David's, would not interfere with their objective; that is precisely why the University staff recommended the procedure, and the reason the Harnichers consented to it.

In addition to the flaws in the majority opinion's characterization of the Harnichers' claims, there are analytic problems with its application of the Restatement standard to the facts. Section 313, which this court has adopted, specifies liability for negligent infliction of emotional distress for "illness or bodily harm." I take the position first, that mental illness of an incapacitating severity—standing alone and unassociated with so-called "physical" symptoms or findings—qualifies as "illness" within the meaning of that section, and second, that even if the standard is read to mean "illness with some bodily harm" (which is in fact how the majority opinion seems to read it), there is evidence in the record to get past summary judgment on the Harnichers' damages.

As to the first question—whether mental illness standing alone qualifies as "illness" within the meaning of the Restatement—I find it anomalous that this court would be willing to deny the possibility in this era of awareness about the severe impact of mental disability on the texture and quality of human life. Any number of conditions associated with mental illness can be incapacitating

without any overt "bodily" manifestations, as, for example, clinical depression, anxiety disorders and panic response, obsessive-compulsive disorders, and eating disorders, to name a few. "Suffering," as is increasingly understood by medicine, is not a phenomenon in which the physical and the mental sources and causes of pain may be readily differentiated. *See generally* Eric J. Cassell, *The Nature of Suffering and The Goals of Medicine* (1991) (arguing that suffering—the quintessential feature of sickness—cannot be analyzed or relieved). Likewise, it is not the case that we refuse in our tort system to attempt quantification and compensation for suffering that has a mental or emotional component. Indeed we undertake such a calculus regularly in wrongful death and personal injury contexts.

Aside from these considerations, however, there is an affidavit in this record filed by a clinical psychologist, with over ten years of experience in "assessment and treatment of mental disorders," who performed rather extensive testing on the Harnichers. He opines as follows in that affidavit:

a. David Harnicher is a 45 year old male of estimated above-average intelligence who is currently experiencing symptoms of depression and anxiety which is [sic] corroborated by testing.

b. David's depressive symptoms include persistent depressed mood, loss of interest in and enjoyment of usual activities, sleep disturbance, fatigue, feelings of inadequacy and diminished confidence, pessimism regarding the future, irritability, social withdrawal, impaired concentration, decreased motivation, diminished work productivity and thoughts of death.

c. David's anxiety symptoms include persistent apprehension and excessive worry, constantly feeling "keyed up," fatigue, concentration difficulties, irritability, muscle tension, sleep disturbance and abdominal discomfort associated with stressful situations.

. . . .

e. The disclosure that his wife's children were not biologically his was especially disappointing and stressful to him because he has not wanted children unless they were his. He had hoped and expected that he would at least be able to believe that the children might be his. This has caused difficulties in his marriage to Stephanie Harnicher.

f. Stephanie Harnicher is a 38 year old female of above average intelligence who suffers from major Depressive Disorder, recurrent, severe, Panic Disorder, and Generalized anxiety disorder which are corroborated by testing.

g. Stephanie's depressive symptoms include the following: Persistent low mood, fatigue, difficulty concentrating, feelings of worthlessness, feelings of hopelessness, decreased appetite with 10 lbs. of weight loss, decreased sexual interest, irritability, periods of crying and having to push herself to do things.

h. Stephanie's panic attacks are characterized by her heart pounding and racing, severe shaking, cold flashes, shortness of breath, inability to speak, a choking sensation, chest and arm pain, dizziness, and fear of losing control or "going crazy."

i. Stephanie further shows more general anxiety symptoms including excessive worry and apprehension, irritability, shaking, grinding her teeth, muscle tension, concentration difficulty, fears about leaving the house and fingernail biting.

j. These symptoms have progressed over time beginning with the disclosure that the donor sperm was mixed up and the children were definitely not Davids (sic). The trauma suffered by Stephanie . . . has gotten progressively worse as she has had to deal with the issues surrounding the disclosure that the children's biological father was neither David, nor the donor chosen by the Harnichers.

Dr. Kocherhans' affidavit concludes with the opinion that "[t]he fact that [the Harnichers] did not seek treatment sooner is not an indication that they were not experiencing genuine suffering" and that "both David and Stephanie are in need of treatment for the above stated disorders."

In light of the foregoing assertions of fact, none of which are controverted in any fashion by the defendants, Stephanie Harnicher's

deposition testimony that she does not claim "bodily harm" as the result of the negligent use of the wrong donor sperm, and David's statement that "I can't think we've claimed anything other than [emotional or mental stress or anguish]" are not dispositive on the question of the existence of mental illness with physical manifestations. Just as one suffering from cancer, from a progressive neurological disease, or even from viral and bacterial infections may not be aware of the disease process and may not attribute symptoms to the correct cause, so a person suffering from mental illness may not be aware of or able to articulate that fact. Indeed, one of the characteristics of the most common form of mental illness—clinical depression—is the lack of insight on the part of the sufferer that an illness process is implicated. Thus I think that even if the Harnichers had explicitly denied suffering from mental illness in their depositions, which they did not, they would still be entitled to offer expert testimony to the contrary, as they have done through the Kocherhans affidavit. An issue of fact sufficient to avoid summary judgment is thus created. Someone with undiagnosed early-stage multiple sclerosis or emphysema might well deny being sick—but not knowing you are ill doesn't mean you aren't.

The Restatement standard under which this court is operating does not require "bodily harm" in addition to "illness," but rather as an alternative. In any event, even if physical symptoms were necessary to establish "illness," as the majority seems to conclude, many of the symptoms described in the Kocherans affidavit readily satisfy such a requirement: e.g., sleep disturbance, fatigue, muscle tension, abdominal discomfort, weight loss, severe shaking, cold flashes, shortness of breath, chest and arm pain, dizziness. Clearly, there are factual questions in this case about causation and the severity of the illness that the Harnichers claim. Those are jury questions. In fact, they are typical jury questions.

The majority appears to be reluctant to view the Harnichers' response to their asserted loss as a damaging one, in view of the fact that they do indeed have three healthy and loved children despite the University's

negligence in performing this procedure. The alleged facts, however, clearly meet the traditional standard for negligence: 1) the existence of a duty on the part of the University to use the donor sperm selected by the Harnichers that would have permitted them to believe the children to be their full biological children; 2) a breach of that duty through the University's mistake in using sperm from the wrong donor; 3) injury consisting of the Harnichers' loss of the opportunity to believe their children to be their full biological offspring; and 4) damages in the form of mental illness requiring treatment, accompanied by physical symptoms. I grant that the facts are only alleged at this point, including those relating to the causation question, but Dr. Kocherans' affidavit asserts facts respecting causation and damages sufficient to exceed the summary judgment threshold.

Most troubling to me, and unnecessary to the result of the majority opinion, is its general tone of disdain for and belittlement of the nature of the suffering claimed by the Harnichers. An extensive body of literature analyzing the experience of infertility, and the complexity of the psychoemotional issues raised by in vitro fertilization, and the use of donor sperm, undercuts the majority's apparent assumption that the result of having children—any children by any means—obviates any possible loss associated with not having the children one planned (and in this case contracted) for. See, e.g., Arthur L. Greil, *Infertility and Psychological Distress: A Critical Review of the Literature,* 45 Soc. Sci. Med. 1679, 1679–1704 (1997); Robert D. Nachtigall, *supra* at 83–89; Barbara Eck Menning, *The Psychology of Infertility, in Infertility: Diagnosis and Management* 17 (James Aiman ed., 1984). In *The Psychology of Infertility,* Barbara Eck Menning observes:

> Many women feel that it is "selfish" to achieve a pregnancy without the genetic contribution of the husband. This loss of genetic continuity is an important factor for the husband to discuss and to accept. No matter how well the donor is matched

to the husband, this loss is real and has to be grieved over . . . .

Both husband and wife may have exaggerated fears as the time of delivery approaches. One fear frequently verbalized is that somehow a mistake in selection of donor may have been made and the resulting baby will have a totally incongruous racial or physical appearance. This fear is the subject of dreams, fantasies, and general anxiety. There may also be more subtle fears regarding the baby's health, intelligence, and attractiveness. To preserve anonymity, very little information is shared about the donor. A great deal of faith must be placed in the hands of the doctor or clinic doing the screening and selecting of donors. *This is a sacred trust that no facility offering donor insemination should take lightly.*

Menning, *supra* at 24.

In conclusion, I believe that a compensable loss and eligible damages have been asserted by plaintiffs and that they are entitled to have their cause of action tried by a jury. I would reverse.

STEWART, J., concurs in the dissenting opinion of Associate Chief Justice DURHAM.