2006 UT App 150

**Kimber Lee ELLISON, Petitioner, Appellant, and Cross-appellee,**

**v.**

**Joshua D. STAM, Respondent, Appellee, and Cross-appellant.**

**No. 20050228–CA.**

Court of Appeals of Utah.

April 13, 2006.

Patricia K. Abbott, Provo, for Appellant.

Michael A. Stout and Timothy J. Curtis, Peterson Reed Warlaumont & Stout, Salt Lake City, for Appellee.

Before GREENWOOD, Associate P.J., McHUGH and ORME, JJ.

## OPINION

McHUGH, Judge:

¶ 1 Kimber Lee Ellison appeals the trial court's order granting Joshua D. Stam's motion to dismiss[1] and revoking an ex parte civil stalking injunction issued against Stam. Stam cross-appeals the trial court's denial of his request for attorney fees. We reverse and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶ 2 In 2004, Ellison and Stam were both students at the College of Eastern Utah

---

1. Although Stam's motion was actually one for a directed verdict,

    a motion for a directed verdict ... contemplates only jury trials. In the context of a bench trial, the directed verdict's procedural counterpart is a motion for involuntary dismissal under rule 41(b) of the Utah Rules of Civil Procedure. Therefore, because this case

was tried by the court without a jury, we treat [Stam]'s motion for a directed verdict as one for an involuntary dismissal pursuant to rule 41(b).

*Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 10, 20 P.3d 388 (citations omitted). Accordingly, we will refer to Stam's motion as a motion to dismiss throughout this opinion.

(CEU) in Price, Utah. In response to a petition filed by Ellison, the trial court entered an ex parte civil stalking injunction, *see* Utah Code Ann. §§ 77–3a–101 to –103 (2003), against Stam on October 5, 2004, which enjoined Stam from stalking Ellison and from engaging in other specified conduct. As required by the statute governing civil stalking injunctions, the trial court, upon Stam's request, held an evidentiary hearing on the injunction. *See id.* § 77–3a–101(6) (providing that "[w]ithin ten days of service of the ex parte civil stalking injunction, the respondent is entitled to request, in writing, an evidentiary hearing on the civil stalking injunction").

¶ 3 At the evidentiary hearing, Ellison presented evidence that Stam had sexually assaulted her on August 25, 2004.[2] Ellison also presented evidence of eight alleged incidents of stalking that occurred after August 25, 2004 (the eight incidents). The dates and facts of the eight incidents, as well as the entry of the ex parte civil stalking injunction, are summarized below.

### August 30, 2004

¶ 4 Ellison was working at the cash register in the CEU cafeteria, and Stam was across the hall from her. Each time Ellison looked at Stam, Stam was glaring at her. As a result of this, Ellison switched to a different cash register.

### September 3, 2004

¶ 5 Ellison and her friend were in a parking lot near Ellison's dormitory building. While in the parking lot, Ellison saw Stam and his friend in the same parking lot. When Ellison noticed Stam looking at her, she went back inside her dormitory room and waited for Stam to leave. When she returned to the parking lot, Ellison saw Stam and his friend sitting in Stam's car, and Stam was staring at her. After several minutes, Stam's car sped out of the parking lot.

2. Concerning this incident, the trial court stated in its written ruling:

> For purposes of this motion only, the court finds that the evidence presented by [Ellison] shows that on August 25, 2004, she was sexually assaulted by [Stam] in Pioneer Park, in

### September 14, 2004

¶ 6 Ellison was returning to her dormitory room in the evening. Ellison and Stam lived in the same dormitory building, with Ellison living on the third floor and Stam living on the second floor. As Ellison climbed the stairs to the third floor, she passed the second floor, where she saw Stam begin to climb the stairs behind her. Once she arrived at the door to her room on the third floor, Ellison saw Stam staring at her from the end of the hallway. Stam then went into another person's room on the third floor.

### CEU Activity (no specific date)

¶ 7 On this evening, Ellison attended a CEU campus activity with some friends, but only after she was told that Stam had already left the same activity. Before she and her friends arrived at the activity, Ellison saw Stam approaching them on his skateboard. After sending another of her friends to distract Stam and prevent him from coming closer to her, Ellison and one of her friends ran to another student's dormitory room and waited for Stam to leave the area. Ellison testified that, as a result of this incident, she suffered a panic attack.

### October 5, 2004

¶ 8 Stam was served with the ex parte civil stalking injunction.

### November 5, 2004

¶ 9 Both Ellison and Stam attended a CEU "Bingo Night" activity, along with about 100 other people. Stam took a seat one table away from Ellison, and Ellison could see Stam looking at her. Ellison reported Stam's presence to a CEU police officer. That officer urged Ellison to switch seats, which she did. Ellison testified that, as a result of this incident, she was crying and shaking.

> Price, Utah, when he laid on top of her, lifted up her shirt and touched her breasts against her will and without her consent, and bit her in several places[,] including her arm, chest, and neck, resulting in bruises that developed shortly thereafter.

*November 11, 2004*

¶ 10 Both Ellison and Stam attended "Club Competition Night" at CEU, where the students in attendance played games against each other. Ellison testified that while at this event, Stam kept "creeping closer and closer" to her. This caused Ellison to become very upset, and tears were running down her cheeks. She reported Stam's conduct to a CEU administrator, who was present at the event as an advisor. That administrator stayed with Ellison, and he tried to stay between Ellison and Stam. While the administrator was with Ellison, Stam got within ten yards of Ellison on two or three occasions. At some point, the administrator told Stam that he was in violation of the ex parte civil stalking injunction. In response, Stam denied that he was violating the injunction. Stam did not leave and continued to play games that brought him within close proximity of Ellison.

*November 19, 2004*

¶ 11 Ellison attended a CEU basketball game with friends. Stam also attended the game, but entered the venue after Ellison. Several minutes after Ellison and her friends sat down, Stam took a seat two rows behind them. This caused Ellison to become upset, and she had one of her friends report Stam's presence to a CEU police officer. When Ellison's friend asked the officer if he could do anything about Stam's proximity to Ellison, the officer said that he could ask Stam to move to a different seat. Ellison testified that, after Stam spoke with the officer, he found a new seat farther away from Ellison. Ellison also testified that after the basketball game, she attended a CEU movie night activity with a friend and that halfway through the movie, Stam entered and took a seat directly behind her.

*November 20, 2004*

¶ 12 Ellison attended the CEU "Fall Ball" with a date. Stam also attended this event. Ellison testified that Stam stared at, continually followed, and repeatedly moved within ten to fifteen feet of her and her date throughout the event. Ellison's date testified that he tried to place himself between Ellison and Stam and that he felt Stam "was close and … knew he was close." Ellison and her date both testified that Ellison became very nervous as a result of Stam's presence.

¶ 13 At the conclusion of Ellison's case, Stam moved to dismiss Ellison's petition and revoke the ex parte civil stalking injunction. After hearing arguments from counsel, the court took the matter under advisement and subsequently issued a written ruling. In this ruling, after making factual findings recounting the events of each of the eight incidents, the trial court stated:

> Although the court finds that the conduct of [Stam] on August 25, 2004 in [the park] was outrageous and intolerable, in that it offends the generally accepted standards of decency and morality, the court cannot find that [Stam's] behavior in any of the … eight incidents rose to the level of "outrageous and intolerable." While his presence on those occasions may have caused [Ellison] to be anxious, scared, or to suffer a panic attack, and may have been insensitive, ungentlemanly, and inconsiderate, given [Stam's] outrageous and intolerable conduct in [the park], it was not "outrageous and intolerable" [during the eight incidents] because his presence and conduct on those occasions did not offend generally accepted standards of decency and morality.

Accordingly, the trial court granted Stam's motion to dismiss and revoked the ex parte civil stalking injunction.

¶ 14 Thereafter, Stam requested an award of attorney fees pursuant to the statute governing civil stalking injunctions. *See* Utah Code Ann. § 77–3a–101(16) (providing that in the context of civil stalking injunctions, "[a]fter a hearing with notice to the affected party, the court may enter an order requiring any party to pay the costs of the action, including reasonable attorney[ ] fees"). The trial court instead considered Stam's fee request under the general statutory provision mandating that fees be awarded when claims are brought without merit and in bad faith. *See id.* § 78–27–56 (2002). Finding that Ellison had not brought the action in bad faith, the trial court denied the fee petition.

¶ 15 Ellison appeals the trial court's grant of Stam's motion to dismiss and revocation of the ex parte civil stalking injunction, and Stam cross-appeals the trial court's denial of his request for attorney fees.

## ISSUES AND STANDARDS OF REVIEW

¶ 16 Ellison argues that the trial court made several errors in its interpretation and application of the relevant statutory provisions. *See id.* §§ 76–5–106.5, 77–3a–101 to –103 (2003). Ellison asserts that the definition of "emotional distress," *id.* § 76–5–106.5(2)(a)(ii), (b)(ii), (c)(ii), used by the trial court is inapplicable in the context of civil stalking injunctions. In addition, Ellison maintains that the trial court improperly applied section 76–5–106.5 because it failed to consider whether the cumulative effect of the eight incidents constituted "a course of conduct." *Id.* § 76–5–106.5(2)(a). Ellison also claims that the trial court erred by failing to determine that Stam violated the ex parte civil stalking injunction and that, under the language of the relevant statutory provisions, *see id.* §§ 76–5–106.5, 77–3a–101 to –103, the trial court erred by failing to enter a permanent stalking injunction based on those violations. "The proper interpretation and application of a statute is a question of law which we review for correctness, affording no deference to the district court's legal conclusion[s]." *Gutierrez v. Medley,* 972 P.2d 913, 914–15 (Utah 1998).

¶ 17 Ellison also challenges the trial court's findings of fact indicating that Stam's conduct was not "directed at" Ellison. Utah Code Ann. § 76–5–106.5(2)(a). "[W]e review the trial court's findings of fact for clear error, reversing only where [a] finding is against the clear weight of the evidence, or if we otherwise reach a firm conviction that a mistake has been made." *ProMax Dev. Corp. v. Mattson,* 943 P.2d 247, 255 (Utah Ct.App.1997).

¶ 18 In his cross-appeal, Stam argues that the trial court erred by failing to grant his petition for attorney fees. "Whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Fericks v. Lucy Ann Soffe Trust,*

2004 UT 85,¶ 22, 100 P.3d 1200 (quotations and citation omitted).

## ANALYSIS

### I. Civil Stalking Injunctions

¶ 19 Utah Code section 77–3a–101 sets forth the procedure a petitioner must follow to obtain an ex parte civil stalking injunction against a respondent. *See* Utah Code Ann. § 77–3a–101. Section 77–3a–101 does not define stalking itself, but instead states that "[a]s used in this chapter, 'stalking' means the crime of stalking as defined in [s]ection 76–5–106.5." *Id.* § 77–3a–101(1). In relevant part, section 76–5–106.5 provides:

(2) A person is guilty of stalking who:

(a) intentionally or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person:

(i) to fear bodily injury to himself or a member of his immediate family; or

(ii) to suffer emotional distress to himself or a member of his immediate family;

(b) has knowledge or should have knowledge that the specific person:

(i) will be placed in reasonable fear of bodily injury to himself or a member of his immediate family; or

(ii) will suffer emotional distress or a member of his immediate family will suffer emotional distress; and

(c) whose conduct:

(i) induces fear in the specific person of bodily injury to himself or a member of his immediate family; or

(ii) causes emotional distress in the specific person or a member of his immediate family.

(3) A person is also guilty of stalking who intentionally or knowingly violates a stalking injunction issued pursuant to Title 77, Chapter 3a, Stalking Injunctions, or intentionally or knowingly violates a permanent

criminal stalking injunction issued pursuant to this section.

*Id.* § 76–5–106.5(2)–(3).

¶ 20 Once a proper petition is filed, and the trial court "determines that there is reason to believe that an offense of stalking has occurred" under section 76–5–106.5, "an ex parte civil stalking injunction may be issued by the court." *Id.* § 77–3a–101(5); *see id.* § 77–3a–101(1). However, "[w]ithin ten days of service of the ex parte civil stalking injunction, the respondent is entitled to request, in writing, an evidentiary hearing on the civil stalking injunction." *Id.* § 77–3a–101(6). "At the hearing, the court may modify, revoke, or continue the injunction," and "[t]he burden is on the petitioner to show by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred." *Id.* § 77–3a–101(7). In other words, to avoid having the injunction revoked, the petitioner must demonstrate by a preponderance of the evidence that respondent's conduct satisfies the elements of section 76–5–106.5. *See id.* § 77–3a–101(1), (7).

## A. Emotional Distress

¶ 21 In *Salt Lake City v. Lopez*, 935 P.2d 1259 (Utah Ct.App.1997), this court clarified the definition of "emotional distress" for purposes of section 76–5–106.5. *See id.* at 1264. In *Lopez*, the appellant claimed that because section 76–5–106.5 did not contain a definition for emotional distress, it was unconstitutionally vague. *See id.* The court rejected this claim, stating that "the tort of intentional infliction of emotional distress is well established in this state," and therefore "emotional distress is well defined in this state." *Id.* at 1264–65; *see also State v. Martel*, 273 Mont. 143, 902 P.2d 14, 19–20 (1995) (holding that use of the phrase "substantial emotional distress" did not render the relevant statute unconstitutionally vague where that phrase was defined by prior tort law); *Woolfolk v. Commonwealth*, 18 Va.App. 840, 447 S.E.2d 530, 533–36 (1994) (same, but with use of the phrase "emotional distress"). The *Lopez* court went on to state that "[e]motional distress results from conduct that is 'outrageous and intolerable in that it offends the generally accepted standards of decency and morali-

ty.'" *Lopez*, 935 P.2d at 1264 (quoting *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 905 (Utah 1992)).

¶ 22 Ellison argues, for several different reasons, that the definition of emotional distress set forth in *Lopez* is inapplicable in the context of civil stalking injunctions. *See* Utah Code Ann. § 77–3a–101. We will address each of her arguments in turn.

### 1. Criminal–Civil Distinction

¶ 23 Ellison contends that because *Lopez* dealt with a criminal conviction for stalking under section 76–5–106.5, its definition of emotional distress is inapplicable in the present civil stalking case. This argument is unpersuasive in light of the legislature's express instruction that both criminal and civil stalking be proved by the same elements. Indeed, section 77–3a–101, which governs civil stalking injunctions, merely incorporates by reference the definition of criminal stalking, stating that "[a]s used in this chapter, 'stalking' means the crime of stalking as defined in [s]ection 76–5–106.5." *Id.* § 77–3a–101(1). Thus, we conclude that there is nothing inappropriate in following the precedent announced in *Lopez* in the context of an allegation of civil stalking.

¶ 24 In a related argument, Ellison maintains that by applying the *Lopez* definition of emotional distress, the trial court erred by "tacitly" requiring Ellison "to prov[e] her case 'beyond a reasonable doubt'" as is required in criminal cases, "despite the fact that it was a civil stalking case." We are unable to find, however, and Ellison has not pointed us to, anything in the trial court's ruling indicating that it applied an incorrect burden of proof. We therefore reject Ellison's argument that simply because the trial court followed this court's decision in *Lopez* to establish the definition of emotional distress, it must have also adopted the criminal standard of proof applicable in *Lopez*.

### 2. Trial Court's Application of *Lopez*

¶ 25 Ellison further contends that the trial court erred in its application of the *Lopez* definition of emotional distress. First, Ellison argues that the trial court "completely

disregard[ed] the 'reasonable person' standard set forth in [section 76-5-106.5]." *See id.* § 76-5-106.5(2)(a)(i)–(ii) (requiring the offending conduct to be of the type "that would cause a reasonable person" to experience the "fear" or "emotional distress" set forth in the statute).

¶ 26 Second, Ellison asserts that the trial court improperly applied section 76-5-106.5 because it failed to consider whether the cumulative effect of the eight incidents constituted "a course of conduct." *Id.* § 76-5-106.5(2)(a) (stating that "[a] person is guilty of stalking who ... intentionally or knowingly engages in a course of conduct directed at a specific person"). In contrast, Stam maintains that each of the eight alleged encounters must be examined independently of any other incident to determine whether it constituted the type of outrageous conduct that could be found actionable. Because we believe these points are related, we deal with them together.

¶ 27 We agree with Ellison that the tort definition of emotional distress must be applied in the context of the other elements of a civil stalking claim. The stalking statute expressly incorporates the reasonable person standard, by defining stalking as "intentionally or knowingly engag[ing] in a course of conduct directed at a specific person that would cause a *reasonable person* ... to suffer emotional distress." *Id.* § 76-5-106.5(2)(a)(ii) (emphasis added). We further agree that any evaluation of a defendant's conduct must be considered in the context of all of the facts and circumstances existing in the case.

¶ 28 The legislature's use of the term "course of conduct," *id.*, illustrates the essence of a stalking violation. Stalking, by its very nature, is an offense of repetition. In relevant part, the statute defines "[c]ourse of conduct" as "repeatedly maintaining a visual or physical proximity to a person." *Id.* § 76-5-106.5(1)(a). The conduct is rendered more offensive and more threatening because it is repeated. To call someone on the telephone and hang up late at night on one occasion may not rise to the level of outrageous conduct. To do so every ten minutes for a month, however, very well may. In essence,

Stam would have the trier of fact consider each telephone call in a vacuum, without reference to the numerous calls that preceded it, to determine whether the conduct is outrageous. We expressly reject that interpretation as being inconsistent with the plain intent of the stalking statute.

¶ 29 In addition to a defendant's course of conduct, the statute requires the trier of fact to consider whether a reasonable person would have suffered emotional distress. *See id.* § 76-5-106.5(2)(a)(ii). The merging of the concepts of emotional distress and a reasonable reaction to it, is also present in this state's jurisprudence regarding tort claims based on emotional distress. In *Lopez*, this court stated that "[e]motional distress results from conduct that is 'outrageous and intolerable in that it offends the generally accepted standards of decency and morality.'" *Salt Lake City v. Lopez*, 935 P.2d 1259, 1264 (Utah Ct.App.1997) (quoting *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 905 (Utah 1992)). Nothing in that decision suggests, nor do we adopt, a limitation on the scope of the analysis that would require the trier of fact to consider each act separately, without reference to other incidents that may have preceded it. Rather, the consideration of whether a defendant has acted outrageously must be undertaken in light of all of the facts and circumstances of the particular case. Contrary to Stam's assertions, this approach is consistent with existing Utah tort law.

¶ 30 In *Harnicher v. University of Utah Medical Center*, 962 P.2d 67 (Utah 1998), the Utah Supreme Court explained that "the emotional distress suffered must be severe; it must be such that a reasonable [person,] normally constituted, would be unable to adequately cope with the mental stress *engendered by the circumstances of the case.*" *Id.* at 70 (alteration in original) (emphasis added) (quotations and citation omitted) (addressing claim for negligent infliction of emotional distress); *see also Hansen v. Mountain Fuel Supply*, 858 P.2d 970, 975 (Utah 1993) (same).

¶ 31 In the tort context, a defendant's knowledge is also relevant to the question of

whether the conduct is extreme and outrageous.

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.

Restatement (Second) of Torts § 46 cmt. f (1965). While the Restatement goes on to reiterate that the conduct must be objectively outrageous, it clearly recognizes that the character of the conduct should be considered in the context of the facts and circumstances of the individual case. *See id.*

¶ 32 Thus, both the plain language of the statute and accepted concepts of tort law reveal that the phrases "emotional distress" and "reasonable person" are not exclusive concepts, but must be considered together to evaluate whether a defendant has violated the civil stalking statute. Therefore, the trial court should have applied the definition of emotional distress set forth in *Lopez* from the perspective of a reasonable person under all the circumstances of the case. Our review of the trial court's written ruling and the record before us suggests that the court did not do so.

¶ 33 Those circumstances include Stam's knowledge. Stam knew he had sexually assaulted Ellison shortly before the eight incidents.[3] In addition, with each subsequent encounter, he acquired additional information about Ellison's reaction to his presence. Yet, even after he was served with the ex parte

injunction and asked by campus officials to keep his distance, Stam continued to place himself in close proximity to Ellison. While it may be simply "ungentlemanly" for a man to glare at a woman and place himself in close physical proximity to her when he has no prior history with her, to do the same shortly after making her the "victim of a vicious sexual assault"[4] may indeed be outrageous under generally accepted standards of decency and morality. Because we believe the trial court inappropriately limited its analysis in a way that negated the cumulative effect of the alleged conduct, we reverse and remand.

### 3. Imposition of Other Tort Elements

¶ 34 Ellison also asserts that the trial court erred by requiring her to prove emotional distress in accordance with the civil, tort law definition set forth in *Lopez* because that was "tantamount to requiring [her] to prove ... the tort of intentional infliction of emotional distress[,] in addition to proving that [Stam] was guilty of stalking under [section] 76–5–106.5."[5] We disagree.

¶ 35 While the *Lopez* court borrowed the definition of emotional distress from *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 905 (Utah 1992), for purposes of section 76–5–106.5, *see Salt Lake City v. Lopez*, 935 P.2d 1259, 1264 (Utah Ct.App.1997), the *Lopez* court did not borrow, or even reference, the remaining elements required to prove a claim for intentional infliction of emotional distress. There is likewise nothing in the written decision of the trial court here to suggest that its decision was based on the other elements of intentional infliction of emotional distress.

*See Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 905 (Utah 1992) ("To prove [a claim for intentional infliction of emotional distress], a plaintiff must show (a) that the defendant intentionally engaged in some conduct toward the plaintiff considered outrageous and intolerable in that it offends the generally accepted standards of decency and morality (b) with the purpose of inflicting emotional distress or where any reasonable person would have known that such would result, and (c) that severe emotional distress resulted as a direct result of the defendant's conduct.").

---

3. Although Stam denies the assault allegations, we must accept them and all other assertions by Ellison as true as for purposes of this appeal. *See Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 3, 108 P.3d 741.

4. In its ruling on Stam's petition for attorney fees, the trial court stated: "Th[is] court previously found that [Ellison] had been the victim of a vicious sexual assault committed by [Stam] resulting in [Ellison] experiencing anxiety and panic when she was around [Stam] subsequent to the assault."

5. The tort of intentional infliction of emotional distress requires proof of three distinct elements.

And, Ellison has not demonstrated how the use of the *Lopez* definition of emotional distress also somehow incorporated the remaining elements of the tort claim.

### B. Course of Conduct Directed at Ellison

¶ 36 Ellison also challenges several of the trial court's factual findings that indicate that Stam's conduct during the eight incidents was not "directed at" Ellison. Utah Code Ann. § 76–5–106.5(2)(a).

█ ¶ 37 For a person to be guilty of stalking, he or she must, among other things, engage in a "course of conduct" that is "directed at a specific person." *Id.* In its written ruling, the trial court considered the events that occurred on each of the eight incidents. The trial court then concluded that

[m]ost of [the] eight incidents involved innocent encounters on a small campus where students are likely to come in contact with each other incidentally as a result of normal college classes and activities. Other than being present on the campus and at certain college[-]sponsored events where [Ellison] was present, no evidence was presented from which the court could find that [Stam] engaged in conduct directed at [Ellison] that would have caused a reasonable person to suffer emotional distress, which is defined as outrageous and intolerable behavior. It is not outrageous or intolerable to be at college [ ]activities or on the campus as a student. Further[,] it does not appear that [Stam's] conduct on those eight occasions was "directed at" causing emotional distress to [Ellison].

¶ 38 As discussed, the respondent's conduct must be considered cumulatively in light of all of the facts and circumstances of the case. We agree with Ellison that the trial court inappropriately considered each incident separately, without weighing the effect of the prior encounters between the parties. The failure to analyze the entire course of conduct between the parties is also inappropriate in determining whether Stam's conduct was "directed at" Ellison. *Id.* § 76–5–106.5(2)(a). Therefore, we reverse and remand.

### C. Permanent Stalking Injunction

¶ 39 Finally, Ellison maintains that the trial court erred by failing to determine that Stam violated the ex parte civil stalking injunction and that, under the language of the relevant statutory provisions, *see id.* §§ 76–5–106.5, 77–3a–101 to –103, the trial court was required to enter a permanent stalking injunction based on those violations.

¶ 40 According to the terms of the ex parte civil stalking injunction, Stam was prohibited from (1) stalking Ellison as defined by the criminal statute, *see id.* § 76–5–106.5; (2) going near Aaron Jones Residence Hall, including the parking lot, and the CEU cafeteria, when Ellison was at the cafeteria; (3) contacting Ellison or three other named individuals directly or indirectly; and (4) residing in the same dormitory complex as Ellison. Stam was served with the ex parte injunction on October 5, 2004. Thus, any alleged knowing violation of the terms of that injunction must have occurred after October 5, 2004.

¶ 41 Ellison asserts that four of the eight incidents occurred after the entry of the ex parte civil stalking injunction. These incidents include the November 5, 2004 "Bingo Night" encounter; the November 11, 2004 "Club Competition Night" encounter; the November 19, 2004 basketball game and movie encounter; and the November 20, 2004 "Fall Ball" encounter.

¶ 42 Ellison does not allege that Stam's conduct on any of these occasions violated the terms of the injunction that prohibited Stam from going near Aaron Jones Residence Hall or the CEU cafeteria, contacting Ellison or her specified friends, or residing in her dormitory complex. Instead, she claims that the four incidents that occurred after the ex parte injunction was issued violated its prohibition against stalking. The ex parte injunction set forth the definition of stalking contained in section 76–5–106.5, *see id.,* and enjoined Stam from engaging in such conduct. Thus, to establish that Stam violated the stalking prohibition in the ex parte injunction, Ellison must prove on remand that Stam is in violation of the stalking statute. *See id.* § 77–3a–101(7) (providing that at the

evidentiary hearing, "[t]he burden is on the petitioner to show by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred"). If Ellison meets that burden, the trial court may modify or continue the civil stalking injunction. *See id.* Until the trial court reaches a decision on that issue, however, Ellison's argument that a permanent civil injunction is mandated is premature and we do not address it.

## II. Attorney Fees

¶ 43 In his cross-appeal, Stam argues that the trial court erred by failing to grant his petition for attorney fees. Although we reverse the decision of the trial court, we address this ancillary issue in the hopes that it will be helpful on remand. *See Armed Forces Ins. Exch. v. Harrison,* 2003 UT 14,- ¶ 38, 70 P.3d 35 (addressing certain issues raised by the appellant even though it was not required because "in the interest of judicial economy, a brief discussion of [those] issues [was] appropriate as guidance for the trial court on remand" (quotations and citation omitted)); *Kilpatrick v. Wiley, Rein & Fielding,* 2001 UT 107, ¶ 36, 37 P.3d 1130 (same).

¶ 44 Stam contends that the trial court erred by applying the requirements of Utah Code section 78–27–56, *see* Utah Code Ann. § 78–27–56 (2002), to determine whether he was entitled to attorney fees because his request for attorney fees was based only upon Utah Code section 77–3a–101(16), *see id.* § 77–3a–101(16). Stam asserts that the standards set forth in these two statutes for awarding attorney fees are mutually exclusive, and therefore, the trial court erred by applying the more general statute, section 78–27–56, instead of the more specific statute, section 77–3a–101(16). We need not address whether the statutes are mutually exclusive because we hold that only section 77–3a–101(16) should have been considered in this case.

¶ 45 Section 77–3a–101(16) provides that in the context of civil stalking injunctions, "[a]fter a hearing with notice to the affected party, the court *may* enter an order requiring any party to pay the costs of the action,

including reasonable attorney[ ] fees." *Id.* § 77–3a–101(16) (emphasis added). In contrast, section 78–27–56 provides:

(1) In civil actions, the court *shall* award reasonable attorney[ ] fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith, except under Subsection (2).

(2) The court, in its discretion, may award no fees or limited fees against a party under Subsection (1), but only if the court:

(a) finds the party has filed an affidavit of impecuniosity in the action before the court; or

(b) the court enters in the record the reason for not awarding fees under the provisions of Subsection (1).

*Id.* § 78–27–56 (emphasis added).

¶ 46 Contrary to Stam's assertion, the fact that section 77–3a–101(16) is more specific because it applies only to civil stalking injunctions is not necessarily determinative of whether it conflicts with section 78–27–56. Although section 77–3a–101(16) applies only in the context of civil stalking, it is permissive in nature, providing the trial court with the discretion to determine whether to award attorney fees. *See id.* § 77–3a–101(16) (providing that the trial court "may" award attorney fees to a party). Section 78–27–56, on the other hand, applies to all "civil actions," *id.* § 78–27–56(1), which would include a civil stalking injunction proceeding, and is mandatory. It dictates the circumstances under which a trial court is required to award attorney fees to a prevailing party. *See id.* § 78–27–56(1) (providing that the trial court "shall" award fees if it makes the appropriate determinations); *Watkiss & Campbell v. Foa & Son,* 808 P.2d 1061, 1068 (Utah 1991) ("If the court finds both elements of [section 78–27–56], then it has no discretion and must award reasonable attorney fees to the prevailing party.").

¶ 47 Here, Stam only requested fees under the discretionary provision of the civil stalking statute. *See* Utah Code Ann. § 77–3a–101(16). Even if the mandatory fee provision found in section 78–27–56 was properly considered and rejected by the trial court absent

a request from Stam, the court's inquiry was not complete. It should have then considered whether to award fees under the discretion provided by the stalking statute itself. Despite its conclusion that the action brought by Ellison had merit and was not brought in bad faith, the court was permitted to award fees under section 77–3a–101(16) and should have indicated whether it was inclined to make such an award. Accordingly, we reverse the trial court's denial of Stam's request for attorney fees and instruct the trial court to consider it on remand under section 77–3a–101(16). Of course, depending on the outcome on remand, it is possible the court will need to consider an award of fees in favor of Ellison.

## CONCLUSION

¶ 48 The trial court erred in its interpretation and application of the statutory provisions governing civil stalking injunctions. *See id.* §§ 76–5–106.5, 77–3a–101 to –103. In addition, the trial court erred by failing to address section 77–3a–101(16) in its ruling on Stam's request for attorney fees. Accordingly, we reverse and remand. If the trial judge who heard the evidence already presented by Ellison is also the trial judge on remand, the case may proceed with Stam's presentation of evidence, unless the judge believes he or she must rehear the entire case due to the passage of time or otherwise in the interest of fairness. If a new judge will be presiding, then justice requires a new trial be held on all issues.

¶ 49 WE CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge and GREGORY K. ORME, Judge.