2011 UT App 136

**Blake D. COOMBS, Petitioner and Appellee,**

v.

**Brett A. DIETRICH, Respondent and Appellant.**

**No. 20090924–CA.**

Court of Appeals of Utah.

April 28, 2011.

---

Daniel S. Drage, Ogden, for Appellant.

Reuben J. Renstrom, Clearfield, for Appellee.

Before Judges DAVIS, McHUGH, and ROTH.

## MEMORANDUM DECISION

ROTH, Judge:

¶ 1 Respondent Brett A. Dietrich appeals the district court's issuance of a civil stalking injunction against him, arguing that the district court's factual findings in support of the stalking injunction are clearly erroneous because there was insufficient evidence from which the district court could find that he committed the underlying offense of stalking. *See generally Houskeeper v. State*, 2008, ¶ 18, 197 P.3d 636 ("[T]he district court's factual findings [are reviewed for] clear error. . . ."). We affirm.

¶ 2 In order to enter a civil stalking injunction, the district court must conclude that "an offense of stalking has occurred" that meets the criteria for the "crime of stalking as defined by [Utah Code] Section 76–5–106.5(2)"—the criminal stalking statute (the Stalking Statute). *See* Utah Code Ann. § 77–3a–101(1), (5) (2008); *Allen v. Anger*, 2011 UT App 19, ¶¶ 1, 14, 248 P.3d 1001 (stating that committing the criminal offense of stalking is a necessary prerequisite to the issuance of a civil stalking injunction). Under the pertinent portions of the Stalking Statute, "[a] person is guilty of stalking [if he] intentionally or knowingly engages in a course of conduct directed at a specific person and knows or should know that the course of conduct would cause a reasonable person[ ] to fear for the person's own safety . . . or to suffer other emotional distress." Utah Code Ann. § 76–5–106.5(2) (2008). "Course of conduct" is defined broadly and requires "two or more acts directed at or toward a specific person, including . . . acts in which the actor follows, monitors, observes, photographs, surveils, threatens, or communicates to . . . a person . . . directly" or "approaches or confronts a person." *Id.* § 76–5–106.5(1)(b).

¶ 3 In October 2008, Blake D. Coombs and his wife (Wife) had recently divorced, and she began a relationship with Dietrich, whom she later married. The civil stalking injunction entered here arose out of three incidents, all involving altercations between Dietrich and Coombs.

¶ 4 The first incident occurred in early December 2008 at a Dairy Queen where Coombs and Wife were supposed to have a court-ordered meeting to discuss their children's schedule for that month. Coombs had asked that Dietrich not attend, but Wife brought Dietrich anyway, as well as one of her and Coombs's children. At Coombs's request, Dietrich sat at a different table with the child while Coombs and Wife reviewed their schedules. The parties dispute whether the purpose of the meeting had been fulfilled, but at some point Wife turned to Dietrich, said something to him, and Dietrich approached the table and said that the meeting was over. Coombs attempted to continue talking with Wife, but she and Dietrich began to leave the Dairy Queen. Coombs, resigned that the meeting was over, followed. As Dietrich got into his car with Wife, he made a disparaging statement to Coombs, calling him something to the effect of "porno king." This statement was made in front of Coombs's child. Although he wanted to say something in response, Coombs ignored the comment and left, but he felt that Dietrich had "no business saying that" and had "no business being" at the meeting. Coombs

further felt that Dietrich's purpose in being present was to take control of the situation and get involved in something that did not concern him.

¶5 The second incident occurred a week or so later at Wife's house, which had been her and Coombs's marital home. Coombs arrived to pick up some of his things that were still at the house. To assist him, Coombs brought his father and brother-in-law; he also brought a local sheriff's deputy in case a problem arose. Coombs arrived at the house, announced his presence, then went to the garage, where his things were being kept. As Coombs gathered his things, Dietrich came into the garage. Coombs responded to Dietrich's presence by telling him that he had no business being there, but Dietrich insisted on staying because he said Wife had asked him to make sure that Coombs did not take anything that was not his.

¶6 As Coombs gathered his things, Dietrich remained in the garage and began making confrontational, insulting, harassing, and provoking comments to Coombs, including calling him a "porno king" again. When Coombs would ask Dietrich to leave, Dietrich would respond by asking Coombs if he was threatening him, as if inviting Coombs to issue a threat in front of the deputy. After gathering his things, Coombs began taking pictures of some other objects in the garage. In response, Dietrich went into the house, got his own camera, and began taking pictures as well—apparently mimicking Coombs. Dietrich would also jump in front of Coombs's camera as he attempted to take pictures. Although Coombs attempted to ignore Dietrich, he described the incident as a "total distraction" because Dietrich was "egging [Coombs] on to threaten him." Further, the deputy was present during this entire incident, and Coombs perceived Dietrich's behavior as being calculated to provoke Coombs to either threaten Dietrich or respond in some way that Dietrich could use against Coombs. According to Coombs's father and brother-in-law, he was noticeably agitated and distressed by Dietrich's presence and behavior.

¶7 The third incident took place several months later in May 2009.[1] Coombs and Wife had recently purchased a car for one of their children, and Coombs had just registered the car. While picking up his children from Wife's house, Coombs went into the garage and began to attach the registration to the car so it could be driven that weekend. Dietrich then entered the garage, wanting to know in whose name the car was registered. Coombs responded that it was none of his business. The two argued. Then the argument escalated into a physical struggle, during which Dietrich pushed Coombs against the car and slammed the car door on Coombs's arm. Dietrich then grabbed the registration paperwork out of Coombs's hands and took the registration as well as the car keys into the house, where Coombs could not follow. It appears that most if not all of this incident occurred in front of Coombs's and Wife's children.

¶8 As a whole, Coombs described the events as embarrassing and harassing. He also described the events as distressing because "they kept getting worse" where "it was at first verbal, then it would start getting [into] pushing, shov[ing]"—"he would try to provoke me constantly."

¶9 The district court entered a civil stalking injunction against Dietrich, concluding that "[Dietrich] caused [Coombs] to fear for his personal safety and/or suffer emotional distress, and that [Dietrich] knew or should have known that his conduct would cause this result in [Coombs] and/or a reasonable person." Regarding the second incident, the district court found that Dietrich had made "threatening," "harassing," and "insulting" comments directed at Coombs "in an attempt to provoke an altercation." The district court further found that Dietrich had no right to "prevent," "inhibit," or "interrupt" Coombs's activities in picking up his property, "particularly in light of the fact that [Coombs] had requested the presence of a police officer to oversee the matter and ensure that order was maintained." Regarding the third incident, the district court found that "[Dietrich] forcibly took the keys to . . . [the] vehicle and the vehicle's registration

1. At this time, Wife and Dietrich were married.

paperwork from [Coombs]" and "pushed [Coombs] against the vehicle and shut the vehicle's door on [Coombs's] arm." The court clearly perceived that Dietrich was the primary aggressor in the incidents.

¶ 10 The district court inferred a pattern of behavior from the three incidents, where Dietrich would routinely interject himself into situations that did not concern him. Dietrich insisted that he only became involved at Wife's request and for her protection, but the district court rejected Dietrich's explanation, finding that Dietrich had not been protecting Wife but had been protecting property. The district court further explained that "[Dietrich] had no right to become involved in the issues pertaining to [Coombs's] divorce from [Wife], retrieval of [Coombs's] personal property, and [Coombs's] visitation with his children." The district court also placed significant emphasis on the fact that these incidents would routinely occur "in the presence of [Coombs's and Wife's] children" and discussed at length the potential harmful effects of such behavior.

■ ¶ 11 After reviewing the record, we cannot say that the district court's factual findings are clearly erroneous. Particularly, there is sufficient evidence in the record to support the district court's findings in support of its ultimate conclusion that Dietrich engaged in a course of conduct that would cause a reasonable person in Coombs's position to fear for his safety.[2]

¶ 12 In order to conclude that Dietrich had committed the offense of stalking, the trial court had to find that he had engaged in a course of conduct, comprised of two or more incidents, that would cause a reasonable person in Coombs's position to fear for his safety. See Utah Code Ann. § 76–5–106.5(1)(b), (2)(a) (2008). The third incident would clearly cause a reasonable person in Coombs's position to fear for his safety, as the altercation with Dietrich escalated from a verbal argument into a physical scuffle, during which Dietrich shoved Coombs against a car, slammed his arm in a car door, and forcibly took Coombs's property from him.[3] In contrast, the first incident does not rise to such a level. Although the interaction sets a troubling prefatory tone in terms of the developing conflict between Coombs and Dietrich— and is illustrative of what the district court perceived to be a wider pattern of Dietrich's interfering behavior—we cannot say that calling a person a "porno king," even in front of his child, would cause a reasonable person to fear for his safety.

■ ¶ 13 Whether the second incident rises to such a level is a closer call. If viewed in isolation, Dietrich's actions during the second incident likely would be insufficient to cause a reasonable person in Coombs's position to fear for his safety. We, however, do not read the plain language of the Stalking Statute to require that each act or incident independently be such as to cause a reasonable person to fear for his or her safety; rather, it is the pattern of behavior or the course of conduct considered in the context

2. Because we conclude that there are sufficient facts from which the district court could conclude that Dietrich's behavior would cause a reasonable person in Coombs's position to fear for his safety, we do not consider whether Dietrich's behavior could also cause emotional distress as required by the Stalking Statute. See generally Utah Code Ann. § 76–5–106.5(2)(b) (2008) (providing that a person commits stalking by engaging in a course of conduct that would cause a reasonable person to "suffer other emotional distress").

This court recently acknowledged that, due to recent amendments to the Stalking Statute, the emotional distress requirement may have changed. See Allen v. Anger, 2011 UT App 19, ¶ 16 n. 4, 248 P.3d 1001 (comparing the 2003 version of the Stalking Statute, see Utah Code Ann. § 76–5–106.5 (2003), with the 2008 version of the Stalking Statute, see Utah Code Ann. § 76–

5–106.5 (2008)). Compare Salt Lake City v. Lopez, 935 P.2d 1259, 1264 (Utah Ct.App.1997) (concluding that under the previous version of the Stalking Statute, the emotional distress required is equivalent to the degree of emotional distress necessary to establish the tort of intentional infliction of emotional distress), with Utah Code Ann. § 76–5–106.5(1)(d) (2008) (defining "emotional distress" as "significant mental or psychological suffering, whether or not medical or other professional treatment or counseling is required"). But because our decision today is based on the fear for safety provision of the Stalking Statute, we do not reach that issue.

3. Dietrich concedes that the third incident was sufficient to cause a reasonable person in Coombs's position to fear for his safety.

of the circumstances that must have that cumulative effect. *See generally Ellison v. Stam,* 2006 UT App 150, ¶¶ 25–33, 136 P.3d 1242 (reasoning that because "[s]talking, by its very nature, is an offense of repetition," the "conduct is rendered . . . more threatening because it is repeated" and should not be considered in a vacuum; thus, the conduct at issue should be considered cumulatively "in the context of the facts and circumstances of the individual case"); *see also* National Ctr. for Victims of Crime, *The Model Stalking Code Revisited,* p. 39 (2007) (providing that "[t]he seriousness of stalking behavior often escalates over time," thus the model stalking code "recommends a general fear requirement that would address conduct that may lead to more violent acts in the future" in contrast to more stringent requirements that "may impede timely intervention"). Viewing the second incident in conjunction with the third incident illustrates that Dietrich's provoking and threatening behavior could—and did, in fact—escalate from taunting into a physical assault. Certainly Dietrich's behavior in the second incident, when placed in the context of the third, can reasonably be seen to be one of "two or more acts directed at or toward a specific person, including . . . acts in which the actor . . . communicates to . . . a person . . . directly" or "approaches or confronts a person" that, together, "would cause a reasonable person[ ] to fear for the person's own safety."[4]   Utah Code Ann. § 76-5-106.5(1)(b).

¶ 14 Nonetheless, Dietrich asserts that the second incident is insufficient to cause a reasonable person in Coombs's position to fear for his safety. Particularly, Dietrich argues that because of the deputy's presence, which was intended to maintain order while Coombs gathered his personal property, Coombs could not have reasonably feared for his safety at that time. However, given the fact that Dietrich acted in such a provoking and confrontational manner despite the deputy's presence, it is possible that the second incident did not escalate into a physical altercation similar to the third incident only due to the deputy's presence. In fact, the district court even noted that it was "telling" that "regardless of the [deputy being] there" to maintain order that Dietrich "continue[d] this harassing behavior."

¶ 15 Dietrich also argues that the relationship between the second incident and the third incident is tenuous at best, given the five-month lapse in time between the two incidents and argues that because of this lapse in time, the two incidents should not be viewed together as part of the same course of conduct. The Stalking Statute, however, defines "course of conduct" broadly, and does not require that the actions that constitute a course of conduct be committed within a certain period of time. *See id.* § 76-5-106.5(1)(b). This is not to say that a lapse of time between incidents should not be considered under the Stalking Statute as part of the context in which the reasonable likelihood of fear is considered. But under the facts of this particular case, this five-month lapse in time is not so long as to make the two incidents unrelated. Indeed, it is disturbing that the third incident escalated in the way it did, despite the lapse in time.

¶ 16 We therefore conclude that the district court's factual findings in support of its ultimate conclusion that Dietrich engaged in a course of conduct that would cause a reasonable person in Coombs's position to fear for his safety are not clearly erroneous and support its decision to issue the stalking injunction in this case. We affirm.

¶ 17 WE CONCUR: JAMES Z. DAVIS, Presiding Judge and CAROLYN B. McHUGH, Associate Presiding Judge.

---

4.  Indeed, the trial court apparently decided that all three incidents contributed to the atmosphere of threat—a conclusion that is not unreasonable considering all the circumstances and Dietrich's escalating behavior.