IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Aiona Butters, | ) | OPINION |
| | ) | |
| Petitioner and Appellee, | ) | Case No. 20110310-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (November 23, 2012) |
| Nathan Gary Herbert, | ) | |
| | ) | 2012 UT App 329 |
| Respondent and Appellant. | ) | |

-----

Fourth District, Provo Department, 100402656
The Honorable James R. Taylor

Attorneys:     Michael J. Petro and Sara F. Lucas, Provo, for Appellant
               Stephen Quesenberry, Jessica Griffin Anderson, and Mark R. Nelson,
               Provo, for Appellee

-----

Before Judges Orme, Davis, and Thorne.

ORME, Judge:

¶1     Aiona Butters obtained a temporary civil stalking injunction against Nathan Gary Herbert following a series of incidents that took place over several years. After a two-day hearing, the district court granted Butters a three-year stalking injunction as well as her attorney fees and costs. Herbert now appeals the district court's decision. We affirm.

BACKGROUND

¶2     The background we set out follows the district court's extensive factual findings.[1] Butters's history with Herbert stretches back to December 2004, shortly after Herbert went on a series of dates with Butters's sister. Butters was with her sister and other relatives in a store when one of her relatives spotted Herbert outside. Not wanting to be seen, the women hid in the back of the store. Herbert had already spotted them, however, and approached them immediately upon entering. He asked if the women were hiding from him, and Butters's sister confirmed that they were. This was the first time that Butters had ever seen Herbert, and she specifically remembered him staring directly at her.

¶3     Not long after that initial incident, Butters encountered Herbert while exercising at a gym. During her workout, a woman informed her that a man behind her was staring at her and touching himself inappropriately. Butters turned around to find Herbert staring directly at her with his hand touching his genital area. After she made eye contact with him, Herbert quickly left the area without saying anything. Butters was uncertain whether Herbert had been fondling himself, as the other woman believed, and decided to give him the benefit of the doubt and try to forget the incident. She did, however, tell her sister about it.

¶4     In March 2005, only a brief time after the gym incident, Butters's sister obtained a civil stalking injunction against Herbert after he choked her. The stalking injunction prohibited Herbert from making contact with Butters's sister and with Butters herself, apparently because of the gym incident. That injunction was in place from March 2005 until March 2009, during which time Butters did not have any problems with Herbert.

¶5     Within one month after the expiration of that stalking injunction, however, Butters again encountered Herbert, this time at a grocery store. As she was walking into the store, Butters saw a vehicle speeding in her direction. The car came to a stop, and Butters saw that Herbert, whom she immediately recognized, was behind the wheel.

---

[1]We note that the district court meticulously laid out its findings of fact and credibility determinations, including its in-court observations of the parties' body language, appearances, and reactions. It did so orally, in ruling from the bench, as is permitted by rule 52. *See* Utah R. Civ. P. 52(a).

She rushed into the store, then turned around to see Herbert's car repeatedly circling her vehicle. This went on for several minutes. Having remembered the "touching" incident at the gym and that Herbert had choked her sister years earlier, Butters was "mortified," "scared," and "really upset" by Herbert's conduct in the parking lot. From inside the store, Butters called the police to report the incident.

¶6     Only three months later, Herbert confronted Butters in the parking lot of a shopping mall. Butters was standing behind her vehicle preparing to enter the mall when Herbert approached her, came within a few feet of her, and silently stared at her. Butters, who at the time was on the phone with her husband, said, "Oh my gosh, [Herbert] is standing right here staring at me." Immediately after she said this, Herbert retreated behind a pillar just in front of the mall entrance. From that vantage point, Herbert continued to stare at Butters until she put her belongings back in her car and drove away. Butters was aware that a restraining order had previously been in place that directed Herbert to stay away from the mall, growing out of an incident in which he bothered a female employee of a department store at the mall. After Butters left, she notified mall security that Herbert was on the premises.

¶7     In August 2010, just over one year after the mall incident, another confrontation occurred at the gym.[2] As Butters entered the gym from the parking lot, Herbert walked out and looked at her with a "glazed fixated look over his face." Butters specifically asked him to leave her alone and went into the gym. Once inside, Butters turned around to look for Herbert and saw him outside, circling her vehicle on foot. Afraid for her safety, Butters asked one of the gym employees if she could stand by him. Herbert then reentered the gym and moved through different exercise areas while constantly watching Butters, who refused to be alone anywhere in the gym. Butters eventually called the police from inside the gym and was advised to go to the police station to fill out the necessary forms for obtaining a stalking injunction.[3] After she filed the necessary

---

[2]In the interim between the mall incident and the second gym incident, Butters came across Herbert at a public library. Although the district court found that Herbert smiled at Butters while in the library, the court concluded that no other overt actions were directed towards Butters, rejecting her testimony to the contrary.

[3]Butters went to the police station to obtain the forms that same day. Herbert apparently showed up at the police station at about the same time, although the district

(continued...)

paperwork with the court, a temporary stalking injunction was granted on August 10, 2010. Herbert requested a hearing, which was held three months later. After considering the testimony and evidence, the district court entered a three-year stalking injunction against Herbert and awarded attorney fees to Butters. Herbert appeals.

ISSUES AND STANDARD OF REVIEW

¶8     Herbert challenges the district court's determination that his actions constituted "a course of conduct directed at" Butters.[4] *See* Utah Code Ann. § 76-5-106.5(2)

---

[3](...continued)
court did not find any facts indicating that Herbert knew Butters would be there. The nature of his police business, if any, is not in the record.

[4]It appears that Herbert's first challenge, as briefed, improperly conflates two separate and distinct issues. On the one hand, Herbert's arguments seemingly challenge the district court's factual findings indicating that his actions were "directed at" Butters, findings which we review for clear error, *see Ellison v. Stam*, 2006 UT App 150, ¶ 17, 136 P.3d 1242. Ultimately, though, Herbert challenges the court's legal determination, premised on those factual findings, that Herbert engaged in a "course of conduct" as defined by the stalking statute, *see* Utah Code Ann. § 76-5-106.5(2) (LexisNexis Supp. 2012), a determination that we review for correctness, *see Bott v. Osburn*, 2011 UT App 139, ¶ 5, 257 P.3d 1022.
    We decline to review Herbert's factual challenge because he has not met his marshaling burden. A party challenging a factual finding must identify "every scrap of competent evidence introduced at trial which *supports* the very findings the appellant resists" and then "ferret out a fatal flaw" in the supporting evidence. *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1315 (Utah Ct. App. 1991) (emphasis in original). Absent the requisite fatal flaw, a finding will stand "even though there is ample record evidence that would have supported contrary findings." *Kimball v. Kimball*, 2009 UT App 233, ¶ 20 n.5, 217 P.3d 733. Herbert has not met this burden. Although he fusses over perceived inconsistencies, credibility issues, and contradictory testimony, Herbert has not pointed to any fatal flaw in the evidence supporting the findings, nor has he explained how any of the alleged evidentiary deficiencies render the court's findings legally untenable. Because of this failure, we take the district court's factual findings "as
(continued...)

(LexisNexis Supp. 2012).[5] He also contends that the district court erred in concluding that a reasonable person in Butters's position would have suffered "emotional distress." *See id.* "'The proper interpretation and application of a statute is a question of law which we review for correctness, affording no deference to the district court's legal conclusion[s].'" *Ellison v. Stam*, 2006 UT App 150, ¶ 16, 136 P.3d 1242 (quoting *Gutierrez v. Medley*, 972 P.2d 913, 914–15 (Utah 1998)) (alteration in original).

¶9     Lastly, Herbert claims that he is entitled to an award of attorney fees incurred during both the district court proceedings and this appeal. "Whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Valcarce v. Fitzgerald*, 961 P.2d 305, 315 (Utah 1998).


ANALYSIS

¶10     For purposes of the statute governing civil stalking injunctions, "'stalking' means the crime of stalking as defined in [the criminal stalking statute]." Utah Code Ann. § 77-3a-101(1) (LexisNexis Supp. 2012). The criminal stalking statute provides, in relevant part, as follows:

> A person is guilty of stalking who intentionally or knowingly engages in a course of conduct directed at a specific person and knows or should know that the course of conduct would cause a reasonable person:

---

[4](...continued)
our starting point." *See id.* All that remains, then, is Herbert's legal challenge to the district court's determination that Herbert's actions constituted a "course of conduct." *See* Utah Code Ann. § 76-5-106.5(2).

[5]Following the events giving rise to this action, the applicable statutory provisions have not been revised in a manner material to this case. Therefore, we cite the current version of the Utah Code as a convenience to the reader.

> (a) to fear for the person's own safety or the safety of a third person; or
>
> (b) to suffer other emotional distress.

*Id.* § 76-5-106.5(2). Herbert contends that his actions do not constitute the requisite course of conduct because each of the incidents involving him and Butters are relatively innocuous when viewed in isolation. He further asserts that his actions do not constitute stalking because they were too sporadic and not outrageous enough to have reasonably caused Butters to suffer emotional distress. Neither argument is persuasive.

## I. Course of Conduct

¶11     Herbert's bizarre confrontations with Butters clearly constitute the kind of "course of conduct" contemplated by the stalking statute. The stalking statute defines a "course of conduct" as

> two or more acts directed at or toward a specific person, including:
>
> > (i) acts in which the actor follows, monitors, observes, photographs, surveils, threatens, or communicates to or about a person, or interferes with a person's property:
> >
> > > (A) directly, indirectly, or through any third party; and
> > >
> > > (B) by any action, method, device, or means; or
> >
> > (ii) when the actor engages in any of the following acts or causes someone else to engage in any of these acts:

> (A) approaches or confronts a
> person[.]

*Id.* § 76-5-106.5(1)(b).

¶12    As the statute makes clear, a single isolated act cannot qualify as a course of conduct. *See id.* Stalking, "by its very nature, is an offense of repetition," *Ellison*, 2006 UT App 150, ¶ 28, and can be accomplished only if multiple acts directed at a specific person are linked together. Accordingly, we do not consider individual acts in a vacuum without regard for the surrounding facts and circumstances. *See id.* (noting that an incident-specific analysis would contradict "the plain intent of the stalking statute"). *See also Allen v. Anger*, 2011 UT App 19, ¶ 22, 248 P.3d 1001 ("A single incident, no matter how outrageous, cannot constitute a course of conduct[.]"). Instead, when determining whether a person's acts constitute a "course of conduct," our cases require that we consider the acts "cumulatively in light of all the facts and circumstances." *Ellison*, 2006 UT App 150, ¶ 38.

¶13    In performing a cumulative analysis, we consider the time elapsed between individual incidents. *See Coombs v. Dietrich*, 2011 UT App 136, ¶ 15, 253 P.3d 1121. We also bear in mind, however, that "course of conduct" is defined broadly "and does not require that the actions that constitute a course of conduct be committed within a certain period of time." *Id.*

¶14    Using the district court's factual findings as our starting point, we easily conclude that Herbert's actions constitute a course of conduct directed at Butters. In April 2009, Herbert directly confronted Butters by speeding towards her in a grocery store parking lot and then circling her parked vehicle for several minutes. Three months later, Herbert both approached and observed Butters in a mall parking lot when he came within mere feet of her, silently stared at her, and continued to watch her after retreating to the mall's entryway. These two events were sufficient to establish the requisite course of conduct, but Butters did not seek an injunction until approximately thirteen months later, when Herbert again confronted her by both circling her car—this time on foot—and reentering a gym behind her and watching her.

¶15    These episodes should not be viewed in a vacuum. It is significant that this sequence of events began on the heels of the expiration of a four-year stalking injunction obtained by Butters's sister, which also extended to Butters. It is particularly

noteworthy that after four confrontation-free years while the first injunction was in effect, Butters saw Herbert circling her vehicle almost as soon as that injunction expired.

¶16 The ensuing sequence of events goes well beyond anything that could possibly be dismissed as a series of coincidental and innocuous incidents. Notably, each of the events involved Herbert silently fixating on Butters while in close proximity to her, circling her vehicle, or both. Such conduct clearly constitutes a pattern of directly approaching and confronting Butters and readily establishes that Herbert engaged in a course of conduct directed at her.

## II. Fear for Safety

¶17 Stalking occurs only when an individual engages in a course of conduct directed at someone else that would cause a reasonable person "(a) to fear for the person's safety or the safety of a third person; *or* (b) to suffer *other* emotional distress." Utah Code Ann. § 76-5-106.5(2) (LexisNexis Supp. 2012) (emphasis added). Herbert maintains that the district court improperly concluded that his actions would cause a reasonable person to suffer emotional distress. Moreover, he asks us to decide whether the "outrageous and intolerable" requirement from *Salt Lake City v. Lopez*, 935 P.2d 1259, 1264 (Utah Ct. App. 1997), and its progeny still applies to the stalking statute in light of the statute's 2008 amendment, which explicitly defined "emotional distress,"[6] *see* Utah Code Ann. § 76-5-106.5(1)(d) (LexisNexis Supp. 2012). While some variants of emotional distress require more elaborate analysis, we need not decide *Lopez*'s continued vitality because we conclude that Herbert's course of conduct would cause a reasonable person to fear for her safety. Fearing for one's safety is the one variant of emotional distress that is specifically mentioned in the statute. *See id.* § 76-5-106.5(2)(a). Thus, we need not look beyond that factor to consider whether Herbert's conduct "would cause a reasonable person . . . to fear for the person's own safety . . . or to suffer other emotional distress." *See id.* § 76-5-106.5(2)(a)–(b).

---

[6]The district court did not discuss the governing standard for emotional distress or whether *Salt Lake City v. Lopez*, 935 P.2d 1259 (Utah Ct. App. 1997), is still relevant in light of the 2008 statutory amendment's adoption of an "emotional distress" definition. The court merely concluded that Herbert "knew or should have known the conduct would cause a reasonable person in her place an[d] in those circumstances to suffer emotional distress."

¶18    As with our "course of conduct" analysis, we do not view the incidents in isolation when determining whether a reasonable person in Butters's position would fear for her safety. *See Coombs v. Dietrich*, 2011 UT App 136, ¶ 13, 253 P.3d 1121. Rather, we evaluate whether the "course of conduct considered in the context of the circumstances" would cause a reasonable person to fear for her safety. *Id.* We note that the statute does not require that actual fear be experienced by the targeted individual, but only that the course of conduct would cause a reasonable person to fear for her safety. *See Bott v. Osburn*, 2011 UT App 139, ¶ 8, 257 P.3d 1022.

¶19    In April 2009, Butters watched Herbert repeatedly circle her vehicle for several minutes. That conduct by itself is alarming, but had that been the first encounter with Herbert, it is likely that a reasonable person may have simply thought the whole thing odd but dismissed it without further concern. Perhaps Herbert was looking for a friend while trying to confirm that this was his car or simply admiring a favorite model of automobile. But when, as here, the man circling Butters's vehicle was not a stranger but rather the very same man who had previously choked her sister and stared at her in a gym while touching his genital area, an innocent explanation does not so readily emerge. Indeed, a reasonable person would most certainly be afraid for her safety if, given their prior history, Herbert continually showed up and deliberately brought himself into contact with her even if his conduct did not amount to overt violence. In sum, we conclude that a reasonable person in Butters's position would fear for her safety.

### III. Attorney Fees

¶20    The civil stalking statute provides district courts with discretion to award reasonable attorney fees to either party. *See* Utah Code Ann. § 77-3a-101(16) (LexisNexis 2008) ("After a hearing with notice to the affected party, the court may enter an order requiring any party to pay the costs of the action, including reasonable attorney fees."). The district court awarded Butters her attorney fees and costs. It has long been accepted that statutes authorizing attorney fee awards include attorney fees on appeal. *See Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998). Moreover, when a party that was awarded attorney fees below prevails on appeal, that party "'is also entitled to fees reasonably incurred on appeal.'" *Id.* (quoting *Utah Dep't of Soc. Servs. v. Adams*, 806 P.2d 1193, 1197 (Utah Ct. App. 1991)).

¶21    As the prevailing party on appeal who was awarded fees below, Butters is entitled to her attorney fees reasonably incurred on appeal. We remand to the district court for a determination of that amount.

CONCLUSION

¶22    Herbert's confrontations with Butters clearly constitute a course of conduct as defined by the stalking statute. Moreover, Herbert's course of conduct would have caused a reasonable person in Butters's situation to fear for her safety. We affirm the district court's imposition of a three-year stalking injunction and award Butters her reasonable attorney fees incurred on appeal. We remand to the district court for a determination of that amount.

_____
Gregory K. Orme, Judge

-----

¶23    WE CONCUR:

_____
James Z. Davis, Judge

_____
William A. Thorne Jr., Judge