**2016 UT App 214**

# THE UTAH COURT OF APPEALS

TIM CARSON,
Appellee,
*v.*
TOM BARNES,
Appellant.

Opinion
No. 20150211-CA
Filed October 27, 2016

Third District Court, Tooele Department
The Honorable Robert W. Adkins
No. 140301827

Bart J. Johnsen and Alan S. Mouritsen, Attorneys
for Appellant

Jeremy M. Shorts, Attorney for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
STEPHEN L. ROTH and DAVID N. MORTENSEN concurred.

TOOMEY, Judge:

¶1     Tom Barnes appeals from a stalking injunction issued
against him, arguing that the underlying events did not meet the
statutory requirements for stalking. We affirm.

BACKGROUND[1]

¶2   In September 2013, a property owner leased approximately forty acres in Tooele County, Utah, to Tim Carson, an owner and principal of TCM Bertha LLC (Bertha). Leading to the property is a gravel road with two gates, one at the turnoff from the highway and one where a railroad track intersects the road. The terms of the lease included "[u]se of the existing gravel road that would allow access to the . . . property." In May 2014, Barnes, a Texas resident, bought the property and became Bertha's landlord. Barnes thereafter purchased and installed locks for the gates and gave Carson a key.

¶3   Bertha is a mining business that focuses on "concentrat[ing] . . . ore in an environmentally clean manner." Part of its activities include sampling buckets of tailings or ore, which it did on the property. To run the business, Carson and mining consultants, Stewart Burgess and Crystal Burgess, a married couple, moved a generator, "crushers," and other equipment onto the property.

¶4   Barnes owned properties in Texas, Florida, and Utah. Because Barnes lived in Texas, Carson and Barnes had little interaction with each other and did not meet until October 2014 when Barnes made a business trip to Utah. Sometime in early October 2014, Barnes took the keys to the generator by cutting a cable that connected them to the generator. Barnes testified that he thought he was "doing [Carson] a favor" by taking the keys because he was concerned leaving the keys connected to the generator "would allow somebody to come out there, start the generator, [and] do whatever they wanted to out there." The

1. "On appeal, when a trial court has made findings of fact to support a civil stalking injunction, we will recite the facts in a light most favorable to the trial court's findings." *Sheeran v. Thomas*, 2014 UT App 285, ¶ 2 n.1, 340 P.3d 797.

Burgesses and Carson were at the property working when Barnes returned the generator keys. Carson "showed him . . . around the property and what [they] were doing and what was going on." Stewart[2] testified that Barnes was angry with Carson for not shutting and locking the gates to the property. The record indicates that Carson and Barnes had an ongoing dispute over locking the gates on the road.

¶5    On October 27, 2014, the Burgesses traveled to the property to work. While they were on their way, Carson called them and told them to take the locks with them as they passed through the gates to prevent Barnes from locking them in. The Burgesses removed the locks and put them in their car. In the late afternoon, while the couple was still working, Barnes arrived looking for Carson. After discovering that Carson had left for the day, Barnes told the Burgesses to "[g]et off the property." He refused to let them clean up or turn off the generator and asked for the locks to the gates. Crystal went to the car and retrieved the locks. Barnes testified that he saw Crystal "go[] to the far side of the vehicle," open the door, and reach in to get something. He was "concern[ed] . . . that she had reached in there to get a gun, or I don't know what." Crystal asked Barnes if he was going to lock them in and testified that Barnes got "very frustrated," went to his vehicle, pulled out a handgun, and loaded it. Barnes also testified that he reached in his vehicle, got his gun, and "put a clip in." At "pointblank range," Barnes pointed the gun at Stewart's head and demanded the locks. He then pointed the gun at Crystal and made the same demand. Crystal gave Barnes the locks and the couple left. The

_____

2. Because the Burgesses "share a last name, we refer to them by their first names for clarity, with no disrespect intended by the apparent informality." *See Earhart v. Earhart*, 2015 UT App 308, ¶ 2 n.1, 365 P.3d 719.

Burgesses called Carson and told him about the incident. Carson called the police.

¶6    After Barnes threatened the Burgesses with a gun, Carson "fear[ed] for [his] safety" and decided to move his operation off the property. On November 3, Carson, with the help of the Burgesses and a few other people, began to move his equipment. While they were doing so, Barnes arrived, "[g]ot in [Carson's] face," and "took some pictures of what they were doing." Carson called the sheriff. The sheriff was delayed in arriving because Barnes had locked the gates as he came in, and Carson had to travel out to unlock them for the sheriff.

¶7    The next day, November 4, as Carson continued to remove his equipment from the property, he noticed Barnes following him. Carson testified that it was dark, he "pulled over off the side of the road" due to some construction on the highway, and he saw Barnes "pull up and come in front of [him]." Carson redirected his route and headed into town behind Barnes. He watched Barnes turn into a parking lot, then pull out of it to follow Carson. Barnes continued to follow Carson to Carson's shop, then "turned off his lights and [sat] there" while Carson unloaded his trailer. Carson called the police, but Barnes pulled away as they arrived. Barnes testified he followed Carson because he "was curious [about] where [he was] going." According to Barnes, "[I]t was [his] understanding that [Carson] should have left that equipment and those improvements out there. And yet he was hauling them off. So [Barnes] thought it would be helpful to know where [Carson] was hauling them."

¶8    On November 6, Carson and his brother were moving equipment and drove down the street where Carson lived. Approaching from the opposite direction, they saw Barnes "going really slow past [Carson's] house." Carson called the police, turned around, and followed Barnes. The police

dispatcher instructed Carson to stop following Barnes and to go to the police department, which he did.

¶9    After these events Carson filed a request for a civil stalking injunction. The district court issued an ex parte order instructing Barnes to stay away from Carson's house and shop and prohibiting him from possessing any firearms while the injunction was in effect.

¶10    The court held an evidentiary hearing on February 11, 2015, and expressed concern that Barnes had cut a cable and taken generator keys that did not belong to him. The court found that, although the lease gave Barnes "some reasonable right to inspect the premises," Barnes's "numerous visits to the lease property" "went beyond that reasonable right." The court further found that the Burgesses' testimony was "more credible than the testimony of . . . Barnes," that they "would fall into the category of coworkers," and that Barnes's actions toward them, "at a very minimum, . . . constituted brandishing a weapon." The court determined that stalking had been established under section 76-5-106.5 of the Utah Code based on Barnes's confrontation with the Burgesses, "[t]he cutting of the cable to get the [generator] keys," and the instances of Barnes following Carson and driving past his house. The court found that Carson reasonably feared for the safety of his family due to these incidents, especially because they involved a firearm. The court therefore ordered "[t]he stalking injunction [to] remain in place . . . with the same terms and conditions as the temporary civil stalking injunction" for three years.

¶11    After the court stated its findings, Barnes asked whether the injunction "would only prohibit [him] from owning/possessing a firearm in the State of Utah" or if it would apply in other states. The court indicated the restriction would apply in Utah and the court was "not going to opine as to what other states may do." The court stated, "How the other states

will interpret it will be up to those other states and [the] federal government." Barnes appeals.

ISSUES AND STANDARDS OF REVIEW

¶12    Barnes raises two issues on appeal. First, he contends the events leading up to the stalking injunction request do not meet the statutory requirements for imposing the injunction. "The proper interpretation and application of a statute is a question of law which we review for correctness, affording no deference to the district court's legal conclusion." *Baird v. Baird*, 2014 UT 08, ¶ 16, 322 P.3d 728 (citation and internal quotation marks omitted).

¶13    Second, Barnes contends the "injunction unlawfully restricts" his constitutional right to own and carry a firearm. "Constitutional issues are questions of law that we review for correctness." *State v. Palmer*, 2008 UT App 206, ¶ 6, 189 P.3d 69 (citation and internal quotation marks omitted).

ANALYSIS

I. The Stalking Injunction

¶14    A district court may issue "a permanent injunction after a hearing if [a] petitioner establishes 'by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred.'" *Baird*, 2014 UT 08, ¶ 22, (quoting Utah Code Ann. § 77-3a-101(7)). The "essential statutory element is proof of 'stalking,'" as defined by Utah Code section 76-5-106.5. *Id.* ¶¶ 22–23. That statute provides,

> A person is guilty of stalking who intentionally or knowingly engages in a course of conduct directed at a specific person and knows or should know that

the course of conduct would cause a reasonable person: (a) to fear for the person's own safety or the safety of a third person; or (b) to suffer other emotional distress.

Utah Code Ann. § 76-5-106.5(2) (LexisNexis 2012). Barnes argues the district court erred in imposing the stalking injunction for two reasons: "First, the primary incident concerning the district court was not 'directed at' Mr. Carson. Second, two of the acts at issue do not form part of a 'course of conduct' that would cause a reasonable commercial tenant to be afraid."

¶15 When interpreting a statute, we begin with "the plain language of the statute." *Dahl v. Dahl*, 2015 UT 79, ¶ 159. "Our primary goal . . . is to effectuate the intent of the Legislature" and "we read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *Id.* (citations and internal quotation marks omitted).

¶16 Barnes asserts that the "entry of the injunction generally . . . was based on the incident on October 27" when Barnes took a handgun from his vehicle and confronted the Burgesses. He contends that "[t]he court's reliance on this incident to enter an injunction" is problematic because Carson was not present, and therefore his actions on that day were not "directed at" Carson as the statute requires. But the statute does not require the victim to be physically present for an act to be considered in the "course of conduct."

¶17 The statute defines "course of conduct" as

> two or more acts directed at or toward a specific person, including: (i) acts in which the actor follows, monitors, observes, photographs, surveils, threatens, or communicates to or about a person, or interferes with a person's property . . . directly,

> indirectly, or through any third party . . . or (ii)
> when the actor . . . approaches or confronts a
> person . . . [or] appears at the person's workplace
> or contacts the person's employer or coworkers.

Utah Code Ann. § 76-5-106.5(1)(b). By the plain language of the statute, the threatening act need not be direct, and it includes situations in which the actor comes to the "person's workplace" or "contacts the person's . . . coworkers," without requiring the presence of the victim. *Id.*

¶18 In this case, the Burgesses were Carson's business associates. They collaborated with him on research and worked together on projects. The Burgesses were present when Barnes returned the generator keys. Although the Burgesses and Barnes did not speak to each other that day, Carson "showed [Barnes] . . . around the property and what [they] were doing and what was going on." We therefore conclude that, although Carson was not physically present when Barnes threatened the Burgesses with a handgun, the district court did not err in considering the confrontation to be part of Barnes's course of conduct because he went "to the lease premises and contacted . . . the Burgesses, who would fall into the category of coworkers." *See Co-worker*, Webster's Third New International Dictionary (1968) ("[O]ne who works with another.").

¶19 Barnes also argues that the events of November 4 (following Carson) and November 6 (driving past Carson's house) "would not have caused a reasonable commercial tenant to fear for himself or for third persons" and therefore "do not form part of a 'course of conduct.'" Rather, "[he] was merely carrying out his responsibilities as landlord." Barnes justifies following Carson on the ground that Carson "should have left that equipment and those improvements out there" and Barnes was therefore "curious" and "interested in where [Carson was] going." Barnes also told the court he drove past Carson's house because Barnes had started the "eviction process" against Carson

and wanted to verify that Carson lived at the address listed on his rent checks. Barnes complains that "[t]he district court never addressed [his] explanation for the November 4 incident and never explained why [his] actions were concerning in light of the parties' relationship and in light of [his] rights under the agreement."

¶20     But as this court has previously stated,

> [w]e . . . do not read the plain language of the [section 76-5-106.5(2)] to require that each act or incident independently be such as to cause a reasonable person to fear for his or her safety; rather, it is the pattern of behavior or the course of conduct considered in the context of the circumstances that must have that cumulative effect.

*Coombs v. Dietrich*, 2011 UT App 136, ¶¶ 2, 13, 253 P.3d 1121. Thus even actions that, "viewed in isolation," might "be insufficient to cause a reasonable person in [the same] position to fear for his safety" can, taken together, cause fear. *Id.* Indeed, "[s]talking, by its very nature, is an offense of repetition," and the events should not be considered "in a vacuum." *Ellison v. Stam*, 2006 UT App 150, ¶ 28, 136 P.3d 1242.

¶21     Here, it is significant that the November 4 and November 6 incidents occurred after Barnes's confrontation with the Burgesses. Carson already had an acrimonious relationship with Barnes and knew Barnes had threatened the Burgesses with a handgun. We agree with Carson that the "threshold incident with the gun impacted all future actions taken by Barnes against Carson."

¶22     Barnes also stated that when he saw Carson moving his equipment he was "curious" and so "followed them, I don't know, maybe a mile." He later said he "didn't follow them."

Carson's testimony gives more detail: it was dark; Barnes was following him, then pulled in front of him; Carson detoured into town; Barnes passed him again, pulled into the parking lot of a hotel and then pulled out again behind Carson; Barnes followed Carson to Carson's shop; Barnes "turned off his lights and [sat] there" while Carson unloaded his trailer; and Barnes pulled away as the police arrived.

¶23 The district court acknowledged that "the lease gives [Barnes] some reasonable right to inspect the premises," but determined that Barnes's "actions went beyond that reasonable right." In addition, the court found that "there was no real reason that [Barnes] needed to drive to [Carson's] residence" because Barnes already had Carson's address on Carson's rent check.

¶24 It is evident from the record that the court considered these incidents in the context of the other events. After noting that Barnes was "observed" when he drove by Carson's residence, the court stated that Carson was "rightfully" concerned "under these circumstances, when [Barnes] had displayed the gun in the presence of the Burgesses and had engaged in the other conduct[:] [t]he cutting of the cable to get the [generator] keys, and the prior times when there was this confrontation between [Carson] and [Barnes] on the lease premises." The court then went on to recount the incident during which Barnes followed Carson.

¶25 We agree with the district court that, "considered in the context of the circumstances," this "pattern of behavior" has a "cumulative effect" that would cause a reasonable person in Carson's position to fear for his safety or the safety of his family. *See Coombs v. Dietrich*, 2011 UT App 136, ¶ 13, 253 P.3d 1121. We therefore conclude the court did not err in considering Barnes's following Carson and driving past Carson's house part of a course of conduct that constituted stalking.

¶26   We determine that the district court did not err either in considering Barnes's confrontation with the Burgesses as part of a course of conduct against Carson, or in determining that following Carson and driving past Carson's house could cause a reasonable person in Carson's circumstances to fear for the safety of his family. Thus, we conclude the district court did not err in issuing the stalking injunction against Barnes.

## II. The Firearms Restriction

¶27   Barnes also contends that, "even if the injunction was properly entered, its restriction on [Barnes's] right to own and possess firearms cannot stand." Barnes's argument on this issue is somewhat unclear, but he seems to argue the restriction violates his constitutional rights and would be contrary to Utah law. This issue is unpreserved.

¶28   In *438 Main Street v. Easy Heat, Inc.*, 2004 UT 72, 99 P.3d 801, our supreme court explained,

> [I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue. This requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding. For a trial court to be afforded an opportunity to correct the error (1) the issue must be raised in a timely fashion[,] (2) the issue must be specifically raised[,] and (3) the challenging party must introduce supporting evidence or relevant legal authority. Issues that are not raised at trial are usually deemed waived.

*Id.* ¶ 51. (alterations in original) (citations and internal quotation marks omitted).

¶29    Here, Barnes did not object in the district court based on the United States Constitution or Utah law, either during the hearing or in his written objection to the drafted order. Although Barnes mentioned his "constitutional right to own and possess a firearm" at the hearing, it was with reference to Carson's motivation for the injunction and not in the form of an objection. For example, Barnes's counsel stated, "[Barnes] believes that Mr. Carson's doing this to try and get at his right to carry a firearm," and, "We truly believe that Mr. Carson is simply doing this to try and affect my client's right to own and possess a firearm here in the state of Utah for the next three years." "General mention of the issue is not enough; parties must specifically identify the issue in a timely manner and provide supporting evidence or relevant legal authority." *State v. Floyd*, 2014 UT App 53, ¶ 6, 321 P.3d 1170 (citation and internal quotation marks omitted); *see also State v. Worwood*, 2007 UT 47, ¶ 16, 164 P.3d 397 ("[P]erfunctorily mentioning an issue, without more, does not preserve it for appeal."). In addition, "a party that makes an objection based on one ground does not preserve any alternative grounds for objection for appeal." *Oseguera v. State*, 2014 UT 31, ¶ 10, 332 P.3d 963.

¶30    In his written objection to the drafted order, Barnes stated he did "not believe that the Court specifically ordered [him] not to own or possess any firearms during this action . . . and request[ed] that [that] language be taken out." Further, he stated that "[t]he standard terms of a Civil Stalking Injunction, providing for [Barnes] not to own or possess a firearm within the State of Utah should apply."[3] He also asserted that "the language

---

3. In his motion, Barnes assumed that the standard terms of a stalking injunction in Utah include a provision prohibiting ownership or possession of a firearm. He argued that the restriction should have effect only in Utah as opposed to

(continued…)

regarding potential Federal violations or applicability should be deleted from the draft of the Order." The rest of the written objection raised Barnes's concern about the "breadth of the order and the firearms restrictions"—specifically, whether it would apply outside of Utah—and requested that the court modify the proposed order or set a hearing for Barnes "to be heard prior to entering the draft of the Civil Stalking Injunction as currently prepared." Nowhere in the written objection does Barnes articulate a constitutional argument or assert that the restriction itself is contrary to Utah law. Because this issue was not "specifically raised," together with "supporting evidence or relevant legal authority," it was not presented to the court in such a way that the court had an opportunity to rule on it, and it is unpreserved. *See id.* (citation and internal quotation marks omitted).

¶31    "When a party raises on issue an appeal without having properly preserved the issue below, we require that the party articulate an appropriate justification for appellate review; specifically, the party must argue either 'plain error' or 'exceptional circumstance.'" *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (quoting *State v. Pinder*, 2005 UT 15, ¶ 45, 114 P.3d 551); *see also Hatch v. Davis*, 2004 UT App 378, ¶ 56, 102 P.3d 774 ("Absent plain error or exceptional circumstances . . . an appellate court will not consider an issue—even a constitutional issue—which is raised for the first time on appeal."). Because Barnes "did not properly preserve his objections below and has failed to argue plain error or demonstrate exceptional circumstances justifying appellate review," his arguments are waived and we decline to address them. *See Pinder*, 2005 UT 15, ¶ 42.

---

(…continued)

anywhere in the United States. Significantly, he did not argue that the prohibition should not be in place at all.

CONCLUSION

¶32    We conclude the district court did not err in issuing the stalking injunction against Barnes, and Barnes has not preserved his constitutional argument against the firearms restriction.

¶33    Affirmed.

————