**2019 UT App 96**

## THE UTAH COURT OF APPEALS

JEDEDIAH WELLS HIGLEY,
Appellee,
*v.*
BRYAN DEAN BUHLER,
Appellant.

Per Curiam Opinion
No. 20180925-CA
Filed June 6, 2019

First District Court, Logan Department
The Honorable Brian G. Cannell
No. 180100393

Glen R. Thomas, Attorney for Appellant

Jedediah Wells Higley, Appellee Pro Se

Before JUDGES GREGORY K. ORME, KATE APPLEBY,
and DIANA HAGEN.

PER CURIAM:

¶1　　Bryan Dean Buhler appeals a permanent civil stalking injunction entered against him in favor of Jedediah Wells Higley. We affirm.

¶2　　"On appeal, when a trial court has made findings of fact to support a civil stalking injunction, we will recite the facts in a light most favorable to the trial court's findings." *Carson v. Barnes*, 2016 UT App 214, ¶ 2 n.1, 385 P.3d 744 (quotation simplified).

¶3　　On September 28, 2018, Higley requested an ex parte civil stalking injunction against Buhler. Higley listed three stalking events in which Buhler allegedly drove by Higley's house a number of times on August 16, 2018, September 6, 2018, and

September 22, 2018. The request contained allegations regarding Buhler's earlier alleged assault of Higley, listing a pending assault case involving Higley and Buhler with a court case number. Higley also attached two police reports. One described a call to police about alleged harassment on August 16, 2018. The other police report described the investigation of the alleged assault and demonstrated that the investigation culminated in Buhler's arrest for assaulting Higley.

¶4　Buhler requested a hearing after the entry of the temporary civil stalking injunction. *See* Utah Code Ann. § 77-3a-101(6) (LexisNexis 2017). At the hearing, Buhler conceded that there was a fight on July 7, 2018, between Higley and Buhler and that Higley's injuries required medical attention. But Buhler challenged the credibility of Higley's account of the events that led to the fight. Buhler also did not directly dispute that he drove by Higley's residence on one or more of the dates alleged in the request for a civil stalking injunction and flipped him off.

¶5　Higley testified and also presented the testimony of his mother, who lived next door to him and had seen Buhler drive by her as she was walking and flip her off. Higley's adult sister testified that she also encountered Buhler, that she heard him refer to her as a "bitch," and that he flipped her off as he drove away. Higley stated that his family felt threatened, unsafe, and uneasy. They were concerned that they did not know what Buhler was "capable of anymore."

¶6　Buhler argued that his conduct could not meet the definition of stalking, claiming that flipping someone off is "protected speech" that cannot constitute an act of stalking unless it is accompanied "with fighting words or some sort of threat." The court inquired about considering the gesture in the context of the fight between the two men. Buhler argued that the events were "so remote in time and place . . . and not even related to the same people. The flipping off would have to put

them under some sort of emotional distress, which they didn't offer any testimony to that effect."[1] Buhler also argued that there was no proof of significant mental or psychological suffering and that there were credibility issues with Higley's account.

¶7     The court refocused the parties on the statutory requirements for a civil stalking injunction. In response to the court, Buhler conceded that the fight occurred, that Higley was harmed, and that he had to go to the hospital for treatment. The court then asked Higley about the allegations in the request for a civil stalking injunction "that there were multiple events in which Mr. Buhler drove by your place of residence. . . . How many times did he go by your place where you see him going by and he gave you the finger?" Higley responded that he saw Buhler do this "three or four times" after the July 7 fight, "like a day or two after he got out of jail from being released from the initial arrest for this, . . . a day or two after that." These three or four additional events after the fight caused him to be in fear of harm. The court inquired whether Buhler wished to reexamine Higley, and his counsel declined.

¶8     The district court found that there was a fight between Higley and Buhler that resulted in some level of harm to Higley. The court found that there was an additional witness—Mr. Higley's mother—who testified that she witnessed "an event of her own being flipped off." The district court found that Buhler had options other than driving past Higley's residence to reach the landfill when he needed to go there for purposes of his work. Buhler also could have driven past the Higley residence without taking the additional action of flipping off Higley (or his mother). The district court found that, regardless of any claim of "free speech," when considered in the context of the July 7, 2018,

---

1. This argument is only pertinent if counsel was referring to the actions of flipping off Higley's mother and sister.

fight—"where there apparently was significant harm"—the court was required under the stalking statute to address the later instances as acts "where . . . the respondent directly observed or communicated to this petitioner," and determine whether those actions "would cause a reasonable person to suffer emotional distress or be afraid for that person's own safety." The court considered the ensuring actions in "the context of the fight and the resulting harm to Mr. Higley." Accordingly, the district court concluded that it was "required . . . at this point to confirm the status associated with that civil stalking injunction and have it remain in place."

¶9 After the court ruled, Buhler's counsel inquired about potential issues regarding the school where both men had children attending. The court directed the parties to stay away from each other if they were both at the school. Buhler did not object at that time to the inclusion of other family members in the injunction's coverage.

¶10 Buhler argues that the district court erred in its interpretation and application of the statutory requirements for a civil stalking injunction. We review the "interpretation and application of a statute" for correctness, "affording no deference to the district court's legal conclusion." *Baird v. Baird*, 2014 UT 08, ¶ 16, 322 P.3d 728 (quotation simplified).

¶11 To obtain a civil stalking injunction, a petitioner must establish the elements necessary to meet the definition of stalking in the criminal code. *See* Utah Code Ann. § 77-3a-101(1).

> (2) A person is guilty of stalking who intentionally or knowingly engages in a course of conduct directed at a specific person and knows or should know that the course of conduct would cause a reasonable person:

(a) to fear for the person's own safety or the safety of a third person; or

(b) to suffer other emotional distress.

Utah Code Ann. § 76-5-106.5(2) (LexisNexis Supp. 2018). A "reasonable person" is defined as "a reasonable person in the victim's circumstances." *Id.* § 76-5-106.5(1)(e). A course of conduct requires "two or more acts directed toward a specific person, including:"

(i) acts in which the actor follows, monitors, observes, photographs, surveils, threatens, or communicates to or about a person, or interferes with a person's property:

(A) directly, indirectly, or through any third party; and

(B) by any action, method, device, or means.

*Id.* § 76-5-106.5(1)(b)(i).

¶12 The inclusion of the phrase "in the victim's circumstances" in the statutory definition of "reasonable person," "provides for an individualized objective standard." *Baird*, 2014 UT 08, ¶ 26 (quotation simplified). "Under this standard, a court must consider the entire context surrounding [respondent's] conduct." *Id.* Thus, a court may consider whether a respondent "had knowledge of a particular vulnerability of the victim and then acted with full knowledge of the victim's vulnerability." *Id.* ¶ 27 (quotation simplified). "Thus even actions that, viewed in isolation, might be insufficient to cause a reasonable person in the same position to fear for his safety can, taken together, cause fear." *Carson v. Barnes*, 2016 UT App 214, ¶ 20, 385 P.3d 744 (quotation simplified); *see also Meyer v. Aposhian*, 2016 UT App 47, ¶ 13, 369 P.3d 1284 (stating a court

does not view the incidents in isolation when determining whether a reasonable person in the petitioner's position would fear for his safety).

¶13 Buhler claims that the evidence was insufficient to establish a course of conduct that constituted stalking. He first claims that flipping someone off is constitutionally protected speech. This specific argument was not presented to the district court for a ruling. In order to preserve an issue for appeal, it "must be specifically raised in a timely manner and must be supported by evidence and relevant legal authority." *See Meyer*, 2016 UT App 47, ¶ 26 (quotation simplified). While Buhler argued in the district court that flipping a person off was protected speech unless combined with other "fighting words," the specific constitutional argument contained in his appellate brief was not presented to the district court and is not preserved for appeal. We do not consider it further.

¶14 Buhler also argues that the court improperly considered irrelevant evidence and that the evidence was otherwise insufficient to establish a course of conduct under the civil stalking injunction statute. In this case, the district court was required to consider the individual circumstances of the petitioner—Higley—and determined that Buhler's actions constituted a course of conduct. *See* Utah Code Ann. § 76-5-106.5(1)(e) (defining a "reasonable person" as "a reasonable person in the victim's circumstances"). As such, the court properly considered whether repeatedly driving past Higley's residence within days of Buhler's release from jail after his arrest for allegedly assaulting Higley would place a reasonable person in Higley's circumstances in fear for his and his family's safety. *See Carson*, 2016 UT App 214, ¶ 21 (stating that the district court did not err in determining that a threshold incident involving a threat with a gun "impacted all future actions" taken by the respondent directed toward the petitioner (quotation simplified)). In addition, the court properly considered the acts

directed toward Higley's mother as corroborating evidence of the course of conduct, as well as Buhler's contacts with other members of Higley's family.

¶15    The district court did not err in determining that Higley demonstrated by a preponderance of the evidence that the civil stalking injunction should remain in place. Considered in context, Buhler's "pattern of behavior ha[d] a cumulative effect that would cause a reasonable person in [the petitioner's] position to fear for his safety or the safety of his family." *Id.* ¶ 25 (quotation simplified). Buhler's conduct—flipping off Higley and his family members—was conduct that "communicates to or about a person," *see* Utah Code Ann. § 76-5-106.5(1)(b)(i), and it was properly considered by the district court in the context of the earlier fight between the two men and other evidence presented to the district court. The court did not err in concluding that the evidence taken as a whole supported continuation of the civil stalking injunction.

¶16    Accordingly, we affirm the decision to enter a permanent civil stalking injunction.

<hr />